EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| **Nelson Rosario Rodríguez,** en su carácter oficial de Comisionado Electoral del partido Proyecto Dignidad<br><br>Peticionario<br><br>v.<br><br>**Hon. Francisco Rosado Colomer; Hon. Jessika Padilla Rivera**<br><br>Recurridos<br><br>**Vanessa Santo Domingo,** en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP); **Ramón A. Torres Cruz,** en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); **Roberto Iván Aponte Berríos,** en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); **Lillian Aponte Dones,** en su carácter de Comisionada Electoral del Partido Movimiento Victoria Ciudadana (MVC), y el **Hon. Pedro Pierluisi Urrutia,** en su carácter de Gobernador de Puerto Rico<br><br>Partes con Interés | 2021 TSPR 160<br><br>208 DPR \_\_\_\_ |

Número del Caso:  CT-2021-14

Fecha: 27 de diciembre de 2021

**Abogado del Comisionado Electoral de Proyecto Dignidad:**

   Por derecho Propio

**Oficina del Procurador General:**

   Lcdo. Fernando Figueroa Santiago
   Procurador General

   Lcdo. Omar Andino Figueroa
   Subprocurador General

   Lcda. Mariola Abreu Acevedo
   Procuradora General Auxiliar

**Abogados de la parte *Amicus Curiae:***

Senado de Puerto Rico

     Lcdo. Víctor Candelario Vega
     Lcda. Alejandra M. Arnaldy Figueroa

**Abogados de las Partes con Interés:**

Comisionado Electoral del
Partido Independentista Puertorriqueño

     Lcdo. Juan Manuel Mercado Nieves

Comisionado Electoral del Partido Nuevo Progresista

     Lcdo. Francisco J. González Magaz

Comisionada Electoral de
Movimiento Victoria Ciudadana

     Lcdo. Manuel A. Rodríguez Banchs
     Lcda. Yanisse P. Caudrado-Ruiz

Comisionado Electoral del Partido Popular Democrático

     Lcda. Naomy N. Ruiz Ruiz
     Lcdo. José Efraín Hernández Acevedo

Materia: Derecho Constitucional y Derecho Electoral – El Presidente y la Presidenta Alterna de la Comisión Estatal de Elecciones pueden continuar desempeñando sus funciones, luego de culminar el término dispuesto en la ley, en virtud de la cláusula de continuidad indefinida establecida en el Código Electoral de 2020.  Revocación de Nogueras v. Hernández Colón, 127 DPR 638 (1991).

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

**Nelson Rosario Rodríguez,** en su carácter oficial de Comisionado Electoral del partido Proyecto Dignidad

      Peticionario

      v.

**Hon. Francisco Rosado Colomer; Hon. Jessika Padilla Rivera**

      Recurridos

**Vanessa Santo Domingo,** en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP); **Ramón A. Torres Cruz,** en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); **Roberto Iván Aponte Berríos,** en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); **Lillian Aponte Dones,** en su carácter de Comisionada Electoral del Partido Movimiento Victoria Ciudadana (MVC), y el **Hon. Pedro Pierluisi Urrutia,** en su carácter de Gobernador de Puerto Rico

      Partes con Interés

CT-2021-14

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 27 de diciembre de 2021.

> The doctrine of *stare decisis* "is at its weakest when we interpret the Constitution because a mistaken judicial interpretation of that supreme law is often practically impossible to correct through other means." (Cita depurada). <u>Ramos v. Louisiana</u>, 140 S. Ct. 1390, 1405 (2020).

La controversia planteada en este recurso se circunscribe a determinar si los funcionarios que actualmente ocupan los cargos de Presidente y Presidenta Alterna de la Comisión Estatal de Elecciones (CEE) pueden continuar desempeñando sus funciones legalmente, luego de culminar el término dispuesto en la ley, en virtud de una cláusula de continuidad indefinida. Esto, a la luz del límite jurisprudencial impuesto en Nogueras v. Hernández Colón, 127 DPR 638 (1991) (*Per Curiam*) (en adelante, **Nogueras II**),[1] sobre la duración máxima de este tipo de cláusula. Treinta (30) años después de haber sido resuelto, y por los fundamentos que exponemos a continuación, tenemos la oportunidad de rectificar dicho precedente y adelantamos que revocamos el mismo resolviendo que una cláusula de continuidad indefinida constituye un mecanismo legislativo válido para vindicar los intereses institucionales del Gobierno. Como resultado, los funcionarios incumbentes en cuestión pueden continuar en sus cargos hasta que sus sucesores sean nombrados y tomen posesión, tal y como dispone la ley. Veamos.

---

[1]   La determinación en Nogueras v. Hernández Colón, 127 DPR 638 (1991) (*Per Curiam*) (en adelante, *Nogueras II*) no sólo fue ampliamente criticada por algunos de los miembros de este propio Tribunal, sino por miembros de la Academia también. Véanse, por ejemplo: el Voto preliminar emitido por el Juez Asociado señor Negrón García el 10 de septiembre de 1990, *Nogueras II*, *supra*, págs. 655-679; la Opinión disidente emitida por el Juez Asociado señor Negrón García el 16 de enero de 1991, *Nogueras II*, *supra*, págs. 679-688; la Opinión disidente emitida por el Juez Asociado señor Rebollo López el 5 de febrero de 1991, *Nogueras II*, *supra*, págs. 688-698, y J.J. Álvarez González, *Derecho constitucional*, 61 Rev. Jur. UPR 637, 680-719 (1992).

**I**

El **30 de junio de 2021** fue el último día de la primera Sesión Ordinaria de la Asamblea Legislativa. Al culminar la misma, vencieron los términos del Hon. Francisco Rosado Colomer y de la Hon. Jessika Padilla Rivera en sus respectivos cargos como Presidente y Presidenta Alterna de la CEE (**recurridos**).

Posteriormente, el **16 de noviembre de 2021**, se levantó la segunda Sesión Ordinaria de la Asamblea Legislativa y el Senado de Puerto Rico (Senado) no actuó sobre las designaciones a los cargos de Presidente y Presidente Alterno de la CEE presentadas por el Gobernador de Puerto Rico, el Hon. Pedro R. Pierluisi Urrutia (Gobernador).

El **23 de noviembre de 2021**, el Lcdo. Nelson Rosario Rodríguez, en su carácter oficial como Comisionado Electoral del partido Proyecto Dignidad (**peticionario** o **Comisionado Electoral de Proyecto Dignidad**), presentó una *Demanda* sobre sentencia declaratoria ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Según razonó, luego de vencer el término de los recurridos y tras concluir la Sesión Ordinaria posterior a la expiración de los nombramientos en cuestión, los cargos de Presidente y Presidente Alterno de la CEE quedaron vacantes.

En ese sentido, el peticionario sostiene que "las actuaciones de los [recurridos] a partir del **[16] de noviembre de 2021**, por realizarse luego de expirado el término constitucionalmente permitido, dejan de ser

oficiales, las determinaciones son nulas y perjudican toda la gestión de la CEE".[2] Así pues, aduce que después de esta fecha, "la CEE no p[odía] celebrar sus reuniones presididas por un [P]residente y la [A]gencia est[aba] acéfala de dirección".[3] De esta forma, solicitó que el Tribunal de Primera Instancia declarara vacantes los referidos cargos.

El 3 de diciembre de 2021, el Comisionado Electoral de Proyecto Dignidad presentó un recurso de *Certificación* ante este Tribunal en el cual sostiene que el periodo de continuidad de los incumbentes recurridos en sus cargos sólo podía extenderse hasta el cierre de la pasada Sesión Ordinaria de la Asamblea Legislativa. Por ende, aduce que los cargos de Presidente y Presidente Alterno de la CEE quedaron vacantes el 16 de noviembre de 2021. Así, arguye que las actuaciones de estos funcionarios, luego de la fecha señalada, son nulas por haber vencido sus nombramientos.

Luego, el 6 de diciembre de 2021, emitimos una *Resolución* mediante la cual ordenamos la paralización de los procedimientos ante el foro de instancia y concedimos término a todas las partes para expresarse.

El 9 de diciembre de 2021, el Senado -representado por su Presidente, el Hon. José Luis Dalmau Santiago- presentó

---

[2] Véase *Demanda* ante el Tribunal de Primera Instancia, Caso Núm. SJ2021CV07763, Apéndice del recurso de *Certificación*, pág. 4. Valga señalar que el Lcdo. Nelson Rosario Rodríguez (peticionario o Comisionado Electoral de Proyecto Dignidad) aclaró que en la aseveración 12 de la *Demanda* se alegó erróneamente que "[la] sesión legislativa concluyó el 18 de noviembre de 2021". Véase recurso de *Certificación*, pág. 3 esc. 1.

[3] *Demanda* ante el Tribunal de Primera Instancia, Apéndice del recurso de *Certificación*, pág. 4.

una *Moción solicitando autorización para comparecer como amicus curiae*. Este Tribunal declaró *ha lugar* dicha solicitud el 13 de diciembre de 2021.[4]

Contando con la comparecencia de todas las partes, nos encontramos en posición de resolver la controversia ante nuestra consideración y atendemos el recurso de epígrafe sin trámite ulterior en conformidad de la Regla 50 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-B.

## II

### A. El recurso de certificación intrajurisdiccional

El recurso de certificación intrajurisdiccional es un mecanismo procesal discrecional. Véase Pierluisi *et al.* v. CEE *et al.*, 204 DPR 841, 853 (2020) (citando a Senado de PR v. ELA, 203 DPR 62, 69 (2019)). Éste puede ser expedido a iniciativa propia o a solicitud de parte para elevar de inmediato ante la consideración de este Foro todo asunto pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones cuando se plantean, entre otros factores, **"cuestiones de alto interés público que incluyen un asunto constitucional sustancial al amparo de la Constitución de Puerto Rico o de Estados Unidos"**. (Cita depurada). Pierluisi *et al.* v. CEE *et al.*, *supra*.[5]

---

[4] En cuanto a la *Urgente comparecencia especial* presentada el 16 de diciembre de 2021 por la Oficina del Procurador General de Puerto Rico, en representación del Hon. Francisco Rosado Colomer y de la Hon. Jessika Padilla Rivera como Presidente y Presidenta Alterna de la Comisión Estatal de Elecciones respectivamente, proveemos *No Ha Lugar* a la misma.

[5] Véanse, además: Art. 3.002 de la Ley Núm. 201-2003, conocida como Ley de la Judicatura de 2003, 4 LPRA sec. 24s(f); Art. 13.1 del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020 (Código Electoral de 2020); Regla 52.2(d) de Procedimiento Civil de 2009, 32 LPRA Ap. V;

El auto de certificación intrajurisdiccional ha sido utilizado por este Tribunal "'para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención'". Pierluisi *et al.* v. CEE *et al.*, *supra*, pág. 854 (citando a PIP v. ELA, 186 DPR 1, 9 (2012); UPR v. Laborde Torres y otros, 180 DPR 253, 272-273 (2010)). En ese sentido, hemos expresado que **"este mecanismo es de vital importancia y utilidad cuando se cuestiona la legitimidad de los procesos democráticos y nuestras instituciones"**. (Negrillas suplidas). Pierluisi *et al.* v. CEE *et al.*, *supra*, pág. 854.

Debido a la naturaleza excepcional de este mecanismo, se requiere que, al analizar si procede su expedición, consideremos los factores siguientes: "(1) la urgencia, (2) la etapa en que se encuentran los procedimientos, (3) la necesidad que puede presentarse de recibir prueba, y (4) la complejidad de la controversia". Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 849 (2014).

**B. La sentencia declaratoria**

Hemos definido la sentencia declaratoria como un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial

---

Regla 24 del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI-B. Véase, también, R. Hernández Colón, *Práctica Jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, Sec. 5623, pág. 574.

contra quien la solicita". Senado de PR v. ELA, *supra*, pág. 71 (citando a Alcalde de Guayama v. ELA, 192 DPR 329, 333 (2015)). Este mecanismo está disponible aunque existan otros remedios y tiene la eficacia de una sentencia o resolución definitiva. Senado de PR v. ELA, *supra*, pág. 71.

Así pues, "[l]a sentencia declaratoria es aquella que se dicta en un proceso en el cual los hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social". R. Hernández Colón, *Práctica Jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, Sec. 6001, pág. 623.

## C. El Código Electoral de Puerto Rico de 2020

La Ley Núm. 58-2020, conocida como el Código Electoral de Puerto Rico de 2020 (Código Electoral de 2020), 16 LPRA sec. 4501 *et seq.*, fue aprobada el 20 de junio de 2020. Ésta denomina al sistema electoral como "una inversión vital para garantizar la democracia en Puerto Rico". Exposición de Motivos del Código Electoral de 2020, pág. 4. De conformidad con lo anterior, esta ley reconoce que la CEE "tiene que ser una agencia pública en **funcionamiento continuo** y disponible para coordinar cualquier evento electoral que se le ordene por ley en o fuera del año de elecciones generales". (Negrillas suplidas). Íd. Así, este estatuto procura garantizar "la continuidad operacional

de la CEE adoptando nuevas condiciones para modernizar a esta agencia, hacerla menos costosa y más eficiente sin sacrificar el derecho del pueblo soberano a ser convocado en cualquier momento para ejercer su derecho al voto cuando fuese necesario, según se desprende de la Constitución". Íd.

La CEE es el ente "responsable de planificar, organizar, dirigir y supervisar el organismo electoral y los procedimientos de naturaleza electoral que, conforme [al Código Electoral de 2020] y a las leyes federales aplicables, rijan en cualquier [v]otación a realizarse en Puerto Rico". Art. 3.2 del Código Electoral de 2020, 16 LPRA sec. 4512. El Código Electoral de 2020 cataloga a la CEE como un "organismo colegiado, deliberativo y adjudicativo", y establece que "los miembros propietarios de la Comisión con voz y voto serán un Presidente; un mínimo de dos (2) y hasta un máximo de tres (3) Comisionados Electorales propietarios en representación de cada partido estatal principal con franquicia electoral después de la elección general más reciente […]". Art. 3.1 (2)(a) del Código Electoral de 2020, 16 LPRA sec. 4511. Asimismo, dispone que, como parte de los miembros *ex officio* de la CEE, se encuentra el Presidente Alterno, quien tendrá voz, pero no voto a menos que el Presidente le delegue su representación. Art. 3.1 (2)(b) del Código Electoral de 2020, *supra*.

De esta forma, la autoridad máxima ejecutiva y administrativa de la CEE es su Presidente, quien es "responsable de supervisar los servicios, los procesos y los eventos electorales en un ambiente de absoluta pureza e imparcialidad". Art. 3.8 del Código Electoral de 2020, 16 LPRA sec. 4518. Entre los deberes y las facultades del Presidente de la CEE se encuentran los siguientes:

> (1) Cumplir y hacer cumplir las disposiciones y los propósitos de este subtítulo, la Constitución de Puerto Rico y de Estados Unidos de América, de las leyes que ordenen o instrumenten cualquier tipo de proceso electoral o [v]otación y de los reglamentos electorales que, por virtud de ley, sean aprobados por la Comisión y los acuerdos unánimes de los Comisionados Electorales.
>
> (2) Representar a la Comisión ante cualquier foro o entidad pública y privada; y ser su principal portavoz institucional.
>
> (3) Aprobar las reglas, los reglamentos y los planes que sean necesarios para la administración y las oficinas administrativas de la Comisión. Estos reglamentos administrativos deberán publicarse en la página cibernética de la Comisión.
> . . . . . . . .
> Art. 3.8 del Código Electoral de 2020, 16 LPRA sec. 4518.

De otro lado, en cuanto a los nombramientos del Presidente y del Presidente Alterno de la CEE, el Art. 3.7 del Código Electoral de 2020, 16 LPRA sec. 4517, dispone -en lo pertinente- lo siguiente:

> (1) Los Comisionados Electorales propietarios nombrarán un Presidente y un Alterno al Presidente conforme a este subtítulo, quienes actuarán como representantes del interés público en la Comisión. Se requerirá la participación de todos los Comisionados Electorales propietarios y el voto unánime de estos para hacer los nombramientos de los cargos de Presidente y Alterno al Presidente.

(2) El Presidente y el Alterno al Presidente serán nombrados no más tarde del primero (1ro) de julio del año siguiente a una elección general. El término para los cargos antes mencionados será de cuatro (4) años a partir de esa fecha, **hasta que los sucesores sean nombrados y tomen posesión del cargo**.

(3) Corresponderá al Comisionado Electoral del Partido Estatal de Mayoría, cuyo partido hubiere obtenido en la anterior elección general la mayor cantidad de votos íntegros en la papeleta estatal del total de votos válidos emitidos en esa papeleta, proponer a los restantes Comisionados propietarios el o los nombres de los candidatos a los cargos de Presidente y de Alterno al Presidente. **Si al término de treinta (30) días naturales de haber surgido una vacante en el cargo de Presidente y/o del Alterno del Presidente no se lograra la unanimidad de los comisionados electorales propietarios para cubrir la vacante, entonces el Gobernador deberá hacer el nombramiento del o los candidatos para cubrir el o los cargos vacantes** […]. (Subrayado y negrillas suplidos).

Entonces, vemos que el precitado artículo dispone una cláusula de continuidad aplicable a los nombramientos del Presidente y Presidente Alterno de la CEE. Ciertamente, tal precepto es cónsono con la finalidad de este estatuto de mantener a la CEE en un funcionamiento continuo, de manera que pueda estar disponible para coordinar cualquier evento electoral ordenado por ley, ya sea en o fuera del año de elecciones generales.

**D. La cláusula de continuidad indefinida**

La cláusula de continuidad -también conocida como cláusula de *holding over*- es un mecanismo que asegura que un funcionario designado por un término fijo de años continúe en el cargo al finalizar el periodo para el cual fue designado. Actualmente, estas cláusulas pueden

encontrarse en múltiples leyes vigentes e incluso en la Constitución de Puerto Rico respecto a otros funcionarios.[6] En el pasado, hemos sido consistentes al reconocer la importancia que tiene este tipo de cláusula para la continuidad de las funciones gubernamentales.

En el caso González v. Corte, 62 DPR 160 (1943), este Tribunal tuvo la oportunidad de expresarse por primera vez sobre la utilidad de la cláusula de continuidad en nuestra

---

**6**     A manera de ejemplo, citamos las disposiciones siguientes:

El Art. III, Sec. 22, Const. PR, LPRA, Tomo 1, establece que: "[h]abrá un Contralor que será nombrado por el Gobernador con el consejo y consentimiento de la mayoría del número total de los miembros que componen cada Cámara. El Contralor reunirá los requisitos que se prescriban por ley; desempeñará su cargo por un término de diez años y **hasta que su sucesor sea nombrado y tome posesión**". (Negrillas suplidas).

Por su parte, el Art. 2.2 de la Ley de Ética Gubernamental de Puerto Rico de 2011, Ley Núm. 1-2012, 3 LPRA sec. 1855a, dispone que "[l]a Oficina es administrada por la Dirección Ejecutiva nombrada por el Gobernador, sujeto al consejo y consentimiento del Senado y de la Cámara de Representantes, por un término de diez (10) años o **hasta que su sucesor sea nombrado y tome posesión**". (Negrillas suplidas).

Mientras, el Art. 10(3) de la Ley de la Oficina del Panel sobre el Fiscal Especial Independiente, Ley Núm. 2 de 23 de febrero de 1988, 3 LPRA sec. 99q, expone que:

> [l]os miembros del Panel servirán por un término de diez (10) años al cabo del cual podrán ser nuevamente designados por un término adicional de igual duración. Las personas designadas no podrán ser nombradas por más de un término consecutivo. En caso de que surja una vacante antes de expirar el término de diez (10) años, el nuevo nombramiento se extenderá por el término de diez (10) años. Los términos que sirvan los miembros alternos no se contarán en su contra en caso de que sean designados miembros en propiedad. Los nombramientos cuyo término expire continuarán en función **hasta que su sucesor sea nombrado y tome posesión de su cargo.**
>
>     Este término de diez (10) años se extenderá a los miembros del Panel que a la fecha de la aprobación de esta ley estén en sus cargos, y se computará a partir de la fecha en que éstos prestaron su juramento, una vez confirmados por el Senado y la Cámara de Representantes. (Negrillas suplidas).

De igual manera, el Art. 4 de la Ley Núm. 20-2001, conocida como la Ley de la Oficina de la Procuradora de las Mujeres, 1 LPRA sec. 312, expresa que: "[l]a Procuradora de la Mujer será nombrada por un término de diez (10) años **hasta que su sucesora sea nombrada y tome posesión del cargo**". (Negrillas suplidas).

jurisdicción.[7]   Allí señalamos que las cláusulas de continuidad tienen dos (2) propósitos, a saber:

> (1) retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor; (2) evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de los asuntos públicos. González v. Corte, *supra*, pág. 165.

Bajo ese marco legal, determinamos que cuando un funcionario ocupa el cargo en virtud de una cláusula de continuidad indefinida, luego de expirar su término fijo de nombramiento, no existe una vacante que el Gobernador pudiese cubrir mediante un nombramiento de receso. González v. Corte, *supra*, pág. 165.   Véase, además, J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 301.

Posteriormente, con relación a un miembro de la Comisión Hípica, reiteramos que "**[b]ajo un estatuto que específicamente contenía una cláusula de 'holding over' como**

---

[7]   En ese caso, luego de evaluar el trato que se había dado por otros estados a las cláusulas de continuidad, reconocimos que "los casos en otras jurisdicciones descansan tan fuertemente en peculiaridades locales de estatutos y constitución y en la diferencia entre funcionarios electivos y por nombramiento, que e[ra] difícil determinar cuán persuasivos [eran] en nuestro caso". González v. Corte, 62 DPR 160, 170 (1943).  Sin embargo, por considerar que es a la Asamblea Legislativa a quien le corresponde establecer este tipo de cláusulas "preferimos seguir los [casos] de [estados] [como] Connecticut, Carolina del Sur y Pensilvania". González v. Corte, *supra*, pág. 175.

**la a[ll]í envuelta, un funcionario cuyo término ha[bía]**

**expirado pero que contin[uaba] en el cargo porque su sucesor**

**todavía no ha[bía] sido nombrado, e[ra] un funcionario *de***

***jure***". (Negrillas suplidas). López v. Tribunal Superior,

79 DPR 20, 23 (1956) (haciendo referencia a González v.

Corte, *supra*, págs. 164-165; Acosta v. Corte, 63 DPR 651

(1944)). Por ende, concluimos que "[e]l lenguaje del

[estatuto] no requ[ería] un resultado tan funesto que dejara

a la comunidad durante cierto período sin una Comisión

legal". (Cita omitida). López v. Tribunal Superior, *supra*,

pág. 24. Luego, en J.R.T. v. Milares Realty, Inc., 90 DPR

844, 858-859 (1964), este Tribunal reafirmó que -en ausencia

de una cláusula de continuidad- el cargo de Presidente de

la Junta de Relaciones del Trabajo se encontraba vacante al

finalizar su término. No obstante, este Foro sostuvo la

validez de sus actuaciones bajo la doctrina de funcionario

*de facto*.[8] Íd.

Finalmente, y a pesar del desarrollo jurisprudencial

sobre las cláusulas de continuidad, en *Nogueras II* este

Tribunal expresó que "[l]a indefinición en el término de

duración de una incumbencia *holding over* atenta[ba] contra

---

[8] Hemos definido la doctrina de funcionario *de facto* como "un principio de derecho que imparte validez a los actos oficiales de personas que, so color de autoridad, ejercen cargos que existen legalmente y en los cuales el público o terceras personas están interesados, cuando el cumplimiento de tales actos oficiales es para beneficio del público o de terceras personas, y no para su beneficio personal". Fernández v. Corte, 71 DPR 161, 181 (1950). Asimismo, hemos indicado que "[l]a necesidad de esta doctrina es manifiesta: sería irrazonable exigirle al público que investigue de antemano el título de los funcionarios con quienes se propone tratar, con el fin de averiguar si se puede confiar o no en la autoridad que asumen". Íd.

el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa". En esa ocasión, alejándose del marco jurisprudencial forjado hasta ese entonces, este Foro señaló que "el término de duración del período posterior a la expiración del término del incumbente (*holding over*) en virtud de la llamada cláusula de continuidad no e[ra] ilimitado". Íd., pág. 652.

En el referido caso, por analogía, este Tribunal descansó en Hernández Agosto v. López Nieves, 114 DPR 601 (1983) (donde establecimos un término máximo de duración a los **nombramientos interinos** fundamentado en los **nombramientos de receso**) para fijar el término máximo permisible respecto a las **cláusulas de continuidad.** *Nogueras II*, *supra*, pág. 677. Véase, además, J.J. Álvarez González, *Derecho constitucional*, 61 Rev. Jur. UPR 637, 705 (1992). **Al así actuar, no advertimos que la cláusula de continuidad no es un ejercicio del poder de nombramiento, sino un mecanismo diseñado para que sea un funcionario debidamente nombrado el que permanezca en el cargo hasta tanto las Ramas Ejecutiva y Legislativa lleguen a un consenso. Es decir, la cláusula de continuidad responde a una elección de política pública alcanzada por las ramas políticas de gobierno.** De esta forma, en el precitado caso se determinó que el término de una cláusula de continuidad "se extendería hasta que su sucesor tome posesión del cargo[,] **pero nunca después de finalizada la próxima sesión**

**legislativa siguiente a dicha expiración**".    (Negrillas

suplidas).  *Nogueras II, supra*, págs. 652-653.

Como mencionamos anteriormente, la decisión de *Nogueras II* fue ciertamente objeto de múltiples críticas no sólo por parte de varios miembros de este Tribunal,[9] sino por la Academia también.[10]  Sobre la fragilidad de sus fundamentos, citamos *in extenso* al profesor José Julián Álvarez González:

> No cabe duda de que Hamilton, correctamente, explicó que el mecanismo de nombramiento de receso es uno secundario, subordinado al método principal que requiere la participación del primer ejecutivo y el

---

[9]  En esa línea, por ejemplo, el Juez Asociado señor Negrón García emitió una Opinión disidente en la cual expresó que:

> [m]ediante esa avenida decisoria, inexplicablemente la mayoría ignor[ó] y revoc[ó] toda la doctrina sobre la cláusula de continuidad establecida desde González v. Corte, 62 D.P.R. 161 (1943); Acosta v. Corte, 63 D.P.R. 651 (1944); Fernández v. Corte, 71 D.P.R. 161 (1950); López v. Tribunal Superior, 79 D.P.R. 20 (1956); J.R.T. v. Milares Realty, Inc., 90 D.P.R. 844 (1964), hasta Betancourt v. Gobernador, 119 D.P.R. 435 (1987). Véase *Nogueras II, supra*, págs. 680-681. (Opinión disidente del Juez Asociado señor Negrón García).

Según señaló el Juez Asociado señor Negrón García, "el único fundamento en que se fund[ó] la mayoría para la nueva visión sobre la cláusula de continuidad [fue] el 'poder compartido' entre el Ejecutivo y el Senado, expuesto en Hernández Agosto v. López Nieves, *supra*". *Nogueras II, supra*, págs. 686. (Opinión disidente del Juez Asociado señor Negrón García).  Por consiguiente, según esbozó, "igualar los efectos de la cláusula de continuidad judicial a la situación distinta de interinato sobrepasa[ba] [toda] imaginación". Íd.

[10]  En lo pertinente, el profesor José Julián Álvarez González comentó lo siguiente:

> Mediante la decisión en *Nogueras II* el Tribunal Supremo prohibió a la Asamblea Legislativa cambiar de opinión, liquidó todas las cláusulas de continuidad indefinida existentes para todo cargo público que requiera confirmación senatorial, **legisló** una cláusula de continuidad de término variable, en ocasiones menor que el que dispuso la Ley 17, y congeló su dictamen en la Constitución.  El poder real del Gobernador en el proceso de nombramientos es hoy mucho mayor que el del Senado.  Y eso no se debe a consideraciones de *realpolitik*, como fue el caso en la era de Muñoz Marín, ni a un error legislativo corregible, como ocurrió con la Ley 17.  El desbalance entre los poderes políticos, favorable al Gobernador, es parte del designio Constitucional.  O al menos eso cree el Tribunal Supremo. (Subrayado y negrillas suplidos).  J.J. Álvarez González, *Derecho constitucional*, 61 Rev. Jur. UPR 637, 719 (1992).

Senado. Pero la aseveración sobre la similaridad de la cláusula de continuidad con el nombramiento de receso no es atribuible a Hamilton. Se trata de un *ipse dixit*[11] del Tribunal Supremo de Puerto Rico. No conozco ninguna otra autoridad que haya sugerido esto, y el Tribunal no presentó ninguna.

El *ipse dixit* del Tribunal no sólo está huérfano de apoyo, sino que es claramente equivocado. La incumbencia en un cargo mediante una cláusula de continuidad no es, contrario a lo que sostuvo el Tribunal, un nombramiento o un ejercicio del poder de nombramientos. Todo lo contrario. Se trata de un mecanismo diseñado para evitar una vacante y, por lo tanto, para evitar un nombramiento de receso. Mediante la inclusión de una cláusula de continuidad[,] el legislador se asegura de que el primer ejecutivo tendrá que contar con el Senado para hacer un nombramiento, es decir, tendrá que utilizar "el medio primario" de nombramientos. J.J. Álvarez González, Derecho constitucional, *supra*, pág. 706 esc. 321.

El profesor Álvarez González razonó que era innecesario que el Tribunal se adentrara en el pantano constitucional al que se arrojó. Véase J.J. Álvarez González, Derecho constitucional, *supra*, pág. 685. En contraste, "la solución más apropiada de *Nogueras II* sólo requería reconocer que la cláusula de continuidad no existía en protección de los jueces, **sino de la función del Senado en el proceso de nombramientos y del funcionamiento eficiente del gobierno**". (Negrillas suplidas). Íd., pág. 694.

---

[11] El término *ipse dixit* se refiere a "[s]omething asserted but not proved". B.A. Garner, Black's Law Dictionary, 9na ed., St. Paul, Minn., West Pub. Co., 2009, pág. 905. Esta frase en latín se traduce al inglés como "he himself said it". Íd.

Coincidimos con sus expresiones. Resulta imposible construir una doctrina coherente en nuestra jurisprudencia para el tratamiento de otros funcionarios cobijados por una cláusula de continuidad a la luz de lo resuelto en dicho precedente. En ese sentido, opinamos que tal precedente es inconsistente con las decisiones que irónicamente cita el caso de *Nogueras II* con aprobación. En vista de lo expuesto, **el caso de *Nogueras II* no tiene espacio en nuestra jurisprudencia y queda hoy <u>revocado</u>**. Como hemos expresado en otras ocasiones, "[e]l propósito inspirador de la doctrina de *stare decisis* es lograr [la] estabilidad y certidumbre en la ley, mas nunca perpetuar errores". <u>Rivera Ruiz *et al.* v. Mun. de Ponce *et al.*</u>, 196 DPR 410, 429 (2016) (citando a <u>Am. Railroad Co. v. Comisión Industrial</u>, 61 DPR 314, 326 (1943)).

**III**

**A**

El Lcdo. Ramón A. Torres Cruz, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático, la Sra. Lillian Aponte Dones, en su carácter oficial como Comisionada Electoral del Movimiento Victoria Ciudadana, así como el Sr. Roberto Iván Aponte Berríos, en calidad de Comisionado Electoral del Partido Independentista Puertorriqueño (Comisionado Electoral del PIP), coinciden en sus alegatos con la posición esbozada por el peticionario. De igual forma, el Senado de Puerto Rico -en calidad de *amicus curiae*- está de acuerdo con los

planteamientos realizados por el peticionario. De esta manera, sostienen que, habiendo vencido el término de los recurridos y transcurrida la Sesión Ordinaria posterior a la expiración de los nombramientos de éstos, los cargos de Presidente y Presidente Alterno de la CEE quedaron vacantes.

Ahora bien, en su *Alegato*, el Comisionado Electoral del PIP reconoce que **declarar vacantes dichos cargos crearía un dislogue administrativo en la CEE y colocaría en una situación precaria los procedimientos electorales del País**.

Por otro lado, la Oficina del Procurador General de Puerto Rico, en representación del Gobernador y de los recurridos, solicita la desestimación del recurso de epígrafe por falta de legitimación activa.[12] No obstante, en la alternativa, argumenta que debe proveerse *No Ha Lugar* al recurso de *Certificación*, pues la norma establecida en *Nogueras II* es incorrecta como cuestión de derecho y amerita ser descartada por este Tribunal. Por su parte, la Lcda. Vanessa Santo Domingo, Comisionada Electoral del Partido Nuevo Progresista, resalta el beneficio que proveen las cláusulas de continuidad a nuestro ordenamiento y plantea que *Nogueras II* es distinguible del presente caso. Así pues, solicita que declaremos *No Ha Lugar* el recurso de *Certificación* presentado.

---

[12] A dicha solicitud proveemos *No Ha Lugar*.

**B**

Al evaluar la procedencia de la expedición del presente recurso notamos que, si bien es cierto que este caso se encuentra en una etapa inicial, no existe la necesidad de recibir prueba alguna, pues la controversia planteada es una de estricto derecho. Además, no existe duda de que la controversia planteada ante este Tribunal está enmarcada dentro de un alto nivel de interés público que comprende la legitimidad de los procesos democráticos y gubernamentales, así como la validez de las actuaciones administrativas de los funcionarios recurridos en la operación institucional de la CEE. Las circunstancias señaladas hacen necesario que elevemos este asunto inmediatamente ante la consideración de este Foro, de manera que pueda ser resuelto con la urgencia que amerita.

**C**

Según adelantamos, la controversia ante nuestra consideración se circunscribe a determinar si los funcionarios que ocupan los cargos de Presidente y Presidenta Alterna de la CEE aquí recurridos pueden continuar desempeñando sus funciones aun después de culminar su término, al amparo de una cláusula de continuidad indefinida y habiéndose levantado la segunda Sesión Ordinaria sin que el Senado hubiese actuado sobre las designaciones presentadas por el Gobernador a esos cargos.[13]

---

[13] En el presente caso no existe controversia acerca de que los funcionarios que ocupan los cargos de Presidente y Presidenta Alterna de la CEE fueron nombrados en conformidad con el proceso establecido en

Fundamentados en un análisis integrado del Código Electoral de 2020, la intención legislativa que sirvió de base para el referido estatuto, así como la jurisprudencia interpretativa de las cláusulas de continuidad, y considerando el momento histórico que vivimos,[14] el cual no deja margen a dudas sobre la necesidad de mantener a la CEE operando de manera continua, hoy nos apartamos de la determinación tomada en *Nogueras II* y contestamos la interrogante sobre si los funcionarios en cuestión pueden seguir ocupando sus cargos en la afirmativa. La contestación no podría ser otra. La cláusula de continuidad cumple una finalidad importante en el funcionamiento de nuestras instituciones gubernamentales, pues permite que funcionarios que han sido nombrados de acuerdo a la ley continúen ejerciendo sus cargos luego de haber vencido el término establecido para éstos hasta tanto el Poder Ejecutivo y el Legislativo se pongan de acuerdo en cuanto a sus sucesores. No podemos perder de perspectiva que, mediante la aprobación de la referida cláusula de continuidad, las ramas constitucionales de gobierno manifestaron su deseo de preservar la continuidad de los trabajos realizados por aquellos funcionarios seleccionados

---

el Código Electoral de 2020. Tampoco existe controversia acerca de que el término establecido para los cargos mencionados venció el 30 de junio de 2021, esto es, al cierre de la primera Sesión Ordinaria de la Asamblea Legislativa. Finalmente, no está en controversia que los referidos cargos están sujetos a una cláusula de continuidad indefinida.

[14] Tomamos conocimiento judicial de los diversos sucesos ocurridos recientemente que harán necesario la celebración de, por lo menos, una elección especial para el puesto de Alcalde del Municipio de Guaynabo.

-de acuerdo a la ley y con el aval legislativo- a los cargos de Presidente y Presidente Alterno de la CEE. De igual forma, con la aprobación del Código Electoral de 2020, ambos poderes constitucionales consignaron de manera expresa su rechazo a la interrupción operacional de la CEE. Al mismo tiempo, repudiaron el disloque que los cargos vacantes ocasionarían en una entidad gubernamental cuyo funcionamiento continuo es necesario para coordinar cualquier evento electoral en o fuera del año de elecciones generales. Reiteramos que esto cobra mayor relevancia en el momento histórico en el que nos encontramos.

El precedente establecido en *Nogueras II* que hoy revocamos deformó la doctrina jurisprudencial firmemente establecida hasta ese momento sobre las cláusulas de continuidad. En ese sentido, resulta imposible armonizar el caso de *Nogueras II* con la doctrina desarrollada durante los casi cincuenta (50) años de jurisprudencia anterior. Ciertamente, las cláusulas de continuidad representan un ejercicio de política pública a favor de la estabilidad de nuestras instituciones gubernamentales. Por lo tanto, concluimos que el mandato legislativo dispuesto en el Código Electoral de 2020 permite que un funcionario -**que ya pasó por un proceso de aprobación**- permanezca **de *jure*** en el cargo al expirar su término fijo de nombramiento hasta que sea debidamente sustituido.

**IV**

Por los fundamentos anteriormente indicados, expedimos el recurso de *Certificación* solicitado y concluimos que el Hon. Francisco Rosado Colomer y la Hon. Jessika Padilla Rivera continúan desempeñando legalmente sus respectivos cargos como Presidente y Presidenta Alterna de la CEE por operación de la cláusula de continuidad provista por ley aun después de comenzar y concluir la sesión legislativa en cuestión, hasta tanto sus sucesores sean nombrados y tomen posesión de sus cargos.

Se dictará Sentencia de conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| **Nelson Rosario Rodríguez,** en su carácter oficial de Comisionado Electoral del partido Proyecto Dignidad<br><br>        Peticionario<br><br>              v.<br><br>**Hon. Francisco Rosado Colomer; Hon. Jessika Padilla Rivera**<br><br>        Recurridos<br><br>**Vanessa Santo Domingo,** en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP); **Ramón A. Torres Cruz,** en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); **Roberto Iván Aponte Berríos,** en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); **Lillian Aponte Dones,** en su carácter de Comisionada Electoral del Partido Movimiento Victoria Ciudadana (MVC), y el **Hon. Pedro Pierluisi Urrutia,** en su carácter de Gobernador de Puerto Rico<br><br>        Partes con Interés | CT-2021-14 |

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de diciembre de 2021.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, expedimos el recurso de *Certificación* solicitado y concluimos que el Hon. Francisco Rosado Colomer y la Hon. Jessika Padilla Rivera continúan desempeñando legalmente sus respectivos cargos como Presidente y Presidenta Alterna de la Comisión Estatal de Elecciones por operación de la cláusula de continuidad provista por ley aun después de comenzar y concluir la sesión legislativa en

cuestión, hasta tanto sus sucesores sean nombrados y tomen posesión de sus cargos.

**Notifíquese de inmediato por teléfono y correo electrónico.**

Lo acordó el Tribunal y certifica el Secretario del Tribunal. El Juez Asociado señor Estrella Martínez emitió una Opinión de conformidad, a la cual se unió el Juez Asociado señor Martínez Torres. El Juez Asociado señor Martínez Torres está conforme con la determinación de la mayoría y hace constar la siguiente expresión:

> Hace diez semanas, en Senado v. Tribunal Supremo y otros, 2021 TSPR 141, 208 DPR ___, ___ (2021), dijimos respecto a **los mismos puestos** que nos ocupan hoy y **con el voto de los dos Jueces que hoy disienten**: "Mientras los Poderes Ejecutivo y Legislativo no lleguen a un acuerdo, los incumbentes permanecerán en el cargo hasta que los sucesores sean nombrados y tomen posesión". **Nada ha cambiado.** Hoy **reafirmamos** esa expresión, por los fundamentos que se expresan en la Opinión del Tribunal. Para ello, revocamos un precedente claramente erróneo, que crea problemas para la continuidad de la gestión pública. Eso justifica esa revocación. Véase: Pueblo v. Camacho Delgado, 175 DPR 1, 20 esc. 4 (2008). Véase, además, González v. Merck, 166 DPR 659, 688 (2006).

La Jueza Presidenta Oronoz Rodríguez disintió con una opinión escrita. El Juez Asociado señor Colón Pérez disintió con una opinión escrita.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Nelson Rosario Rodríguez, en su carácter oficial de Comisionado Electoral del partido Proyecto Dignidad<br><br>Peticionario<br><br>v.<br><br>Hon. Francisco Rosado Colomer; Hon. Jessika Padilla Rivera<br><br>Recurridos<br><br>Vanessa Santo Domingo, en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP); Ramón A. Torres Cruz, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); Roberto Iván Aponte Berríos, en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Lillian Aponte Dones, en su carácter de Comisionada Electoral del Partido Movimiento Victoria Ciudadana (MVC), y el Hon. Pedro Pierluisi Urrutia, en su carácter de Gobernador de Puerto Rico<br><br>Partes con Interés | CT-2021-14 | Certificación intrajurisdiccional |

Opinión de conformidad emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ a la cual se une el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 27 de diciembre de 2021.

Recientemente en Senado v. Tribunal Supremo de Puerto Rico, infra, descartamos que este Tribunal Supremo tuviera el poder desmesurado de nominar y confirmar la Presidencia y la Presidencia Alterna de la Comisión Estatal de Elecciones (CEE). Hoy, descartamos también la posibilidad de que un Gobernador pueda unilateral y desmedidamente controlar ese organismo con nombramientos de receso, tal como si fuera una mera oficina de su gabinete.

El Poder Ejecutivo no puede, sin el consentimiento del Senado, sustituir la presidencia de la CEE con un nombramiento de receso, pues ante la falta de consenso entre los Poderes Políticos, los incumbentes deben permanecer en el cargo hasta que los sucesores sean nombrados y tomen posesión. Lo anterior, **en virtud de la cláusula de continuidad indefinida debidamente legislada previo a surgir esta controversia.**

Al avalar tal disposición, este Tribunal alcanza una interpretación responsable que rectifica el equilibrio dinámico que debe existir entre los Poderes Ejecutivo y Legislativo en cuanto a los nombramientos de cargos que contienen cláusulas de continuidad indefinida.

Con el fin de materializar tal balance, tomamos como premisa base la interrogante siguiente: ¿Tiene el Gobernador de Puerto Rico el poder de realizar un

nombramiento de receso con el propósito de sustituir al Presidente y a la Presidenta Alterna de la CEE, a pesar de que estos funcionarios están cobijados por una cláusula de continuidad indefinida? **Contestamos en la negativa.**

De esta forma, dejamos sin efecto la limitación impuesta jurisprudencialmente en Nogueras v. Hernández Colón, infra, a las cláusulas de continuidad indefinida. En su lugar, retomamos la firme y coherente línea jurisprudencial emitida por este Foro previo al caso precitado.

Es por ello que, ante el reconocimiento de que la aprobación de una cláusula de continuidad por las Cámaras y el Gobernador implica necesariamente una protección a la estabilidad operacional, al interés público, al rol del Senado en el proceso de nombramientos y al funcionamiento eficiente del Gobierno, estoy conforme con la fundamentada Opinión mayoritaria que hoy emite este Tribunal.

Con este proceder, reconocemos la preeminencia de uno de los principios constitucionales cardinales de nuestro sistema de gobierno republicano: la separación de poderes en lo que atañe al proceso de nombramientos. Veamos.

## I

Primeramente, muestro mi conformidad con la facultad ejercida por este Tribunal al certificar intrajurisdiccionalmente la controversia aquí planteada.

A la luz del marco estatutario vigente,[1] consecuentemente he favorecido la expedición de recursos de certificación con el propósito de atender eficaz y oportunamente controversias electorales de alto interés público que requieren nuestra intervención en aras de brindar certeza a nuestro estado de Derecho. Véanse, Senado v. Tribunal Supremo de Puerto Rico, 2021 TSPR 141, pág. 25 (Opinión de conformidad emitida por el Juez Asociado señor Estrella Martínez); Com. Elect. PPD v. CEE et al., 205 DPR 724, 765 (2020) (Opinión de conformidad emitida por el Juez Asociado señor Estrella Martínez); Pierluisi et al. v. CEE et al., 204 DPR 841, 914 (2020) (Opinión de conformidad emitida por el Juez Asociado señor Estrella Martínez); Com. PNP v. CEE et al. I, 196 DPR 651, 654 (2016) (Voto particular de conformidad emitido por el Juez Asociado señor Estrella Martínez).

Ello, máxime, cuando la controversia implica una cuestión constitucional sustancial al amparo de la Constitución de Puerto Rico o Estados Unidos. Pierluisi et al. v. CEE et al., supra, pág. 853 (citando a Senado de PR v. ELA, 203 DPR 62, 69 (2019)).

Ciertamente, nos encontramos ante una controversia de alto interés público que plantea una cuestión constitucional sustancial. En ese sentido, la certificación

---

[1] Ley de la Judicatura, Ley Núm. 201-2003, 24 LPRA sec. 24s(f); Código Electoral de Puerto Rico de 2020, infra. Véase, además, Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V.

aquí emitida provee un remedio adecuado, completo y oportuno que brindará certeza y viabilizará el funcionamiento ininterrumpido de la CEE.

**II**

**A.**

De entrada, no cabe duda de la importancia que tiene la continuidad operacional de la CEE dada la función constitucional que ejerce como la institución que regula uno de los pilares de nuestra democracia: el sufragio.

En reconocimiento de ello, el Código Electoral de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4501, et seq. (Código Electoral), instaura su carácter como "**una institución de operación continua**"[2] con el propósito de que no se "limit[e] al pueblo soberano a no poder votar cuando sea necesario, o con la prontitud que requieran las circunstancias porque su organismo electoral es uno intermitente, cuatrienal o porque su limitada operación no provee el tiempo y los recursos para coordinar un evento electoral". Exposición de motivos, Ley Núm. 58-2020, 2020 (parte 2) Leyes de Puerto Rico 1150, 1156.

La aprobación del Código Electoral responde al mandato que se extiende a la Asamblea Legislativa de "facilitar el sistema electoral de Puerto Rico con todas las garantías posibles de **continuidad**, accesibilidad [y] **certeza**". (Negrillas suplidas). Íd., págs. 1156-1157.

---

[2](Negrillas suplidas). Art. 3.1(5)(a), 16 LPRA sec. 4511(5)(a).

Así, en reconocimiento del carácter continuo que debe imperar en la CEE, y en aras de evitar la interrupción de sus servicios, el Gobernador y las Cámaras incluyeron una cláusula de continuidad —también denominada cláusula <u>holding over</u>— en los dos (2) cargos de la presidencia de la Comisión.

A tales efectos, el Artículo 3.7 del Código Electoral, en lo pertinente, dispone que:

> (2) El Presidente y el Alterno al Presidente serán nombrados no más tarde del primero (1ro) de julio del año siguiente a una elección general. El término para los cargos antes mencionados será de cuatro (4) años a partir de esa fecha, **hasta que los sucesores sean nombrados y tomen posesión del cargo.** (Negrillas suplidas). 16 LPRA sec. 4517(2).

El texto diáfano de la disposición precitada dispone que la Presidencia y la Presidencia Alterna de la CEE: (1) se nombrarán en una fecha cierta; (2) se desempeñarán por un término definido, y (3) serán ocupadas hasta que los sucesores sean nombrados y tomen posesión del cargo.

Es de particular importancia que la prolongación del término hasta que sea ocupado por los sucesores es lo que conocemos como una cláusula de continuidad indefinida.

**B.**

Las cláusulas de continuidad indefinida no son de nuevo cuño, pues éstas están contenidas en nuestra Constitución, así como en diversas leyes de nuestro ordenamiento jurídico. En esencia, el propósito de una cláusula de

continuidad indefinida subyace en que los funcionarios cobijados por ésta no puedan ser sustituidos hasta que el Gobernador, con el consejo y consentimiento legislativo, nombre a un sucesor y éste tome posesión del cargo.[3]

Desde antes de la aprobación de nuestra Constitución, en González v. Corte, 62 DPR 160 (1943), este Tribunal destacó que las cláusulas de continuidad tienen dos (2) propósitos evidentes:

> **[1]** retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor; **[2]** evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de los asuntos públicos. Íd., pág. 165.

---

[3]Tal y como el Lcdo. Christian E. Cortés Feliciano correctamente sintetizó:

> Las cláusulas de continuidad son disposiciones que prorrogan los términos de efectividad de un nombramiento. **Este tipo de cláusulas no constituyen un método de nombramiento per se**, sino que son un mecanismo en virtud del cual un funcionario que ocupa un cargo en propiedad puede continuar ocupándolo aun después de expirado su término hasta tanto su sucesor sea nombrado y tome posesión.(Negrillas suplidas).

C. E. Cortés Feliciano, Nombramientos de receso sucesivos: ¿Despoje de la facultad de consejo y consentimiento del Senado?, 86 Rev. Jur. UPR 192, 204 (2017).

Según se desprende del caso precitado, el principal objetivo legislativo de una cláusula de continuidad es que, "una vez que una persona ha sido confirmada bajo tal estatuto, continuará en el cargo […] hasta que el Senado actúe sobre la nominación de su sucesor". Íd., pág. 166. Como fin secundario, "conlleva también el importante efecto de evitar dificultades administrativas como resultado de vacantes en los cargos". Íd.

En ese sentido, cuando un funcionario está cobijado bajo una cláusula de continuidad, "al expirar su término fijo de nombramiento no se crea una vacante que legitime al Gobernador a expedir un nombramiento de receso".[4] Véase, además, Acosta v. Corte, 63 DPR 651, 656-657 (1944); Fernández v. Corte, 71 DPR 161, 179 esc. 4 (1950). **Por consiguiente, el mecanismo suplementario del nombramiento de receso, que, por su naturaleza, presupone la existencia de una vacante, no está disponible cuando el cargo en cuestión contiene una cláusula de continuidad indefinida.**

Estos precedentes continuaron en pleno vigor hasta luego de la aprobación de nuestra Constitución. Véanse, Betancourt v. Gobernador, 119 DPR 435, 436, 446-449 (1987) (Sentencia) (Opiniones concurrentes de los Jueces Asociados

---

[4] J.J. Álvarez González, Derecho constitucional, 61 Rev. Jur. UPR 637, 685 (1992) (citando a González v. Corte, supra, pág. 165). Distinto es la conclusión cuando determinado cargo no cuenta con una cláusula de continuidad, pues, en ausencia de ésta, el funcionario puede ser sustituido a partir del vencimiento del término, inclusive, con un nombramiento de receso. J.R.T. v. Mirales Realty, Inc., 90 DPR 844, 858 (1964).

señores Negrón García y Alonso Alonso); <u>López v. Tribunal Superior</u>, 79 DPR 20, 23 (1956); <u>J.R.T. v. Mirales Realty, Inc.</u>, supra, pág. 858 (citando con aprobación a <u>Gonzaléz v. Corte</u>, supra; <u>Acosta v. Corte</u>, supra; y <u>Fernández v. Corte</u>, supra).

No obstante, posteriormente en <u>Nogueras v. Hernández Colón</u>, 127 DPR 638 (1991) (<u>Per Curiam</u>), este Tribunal revirtió y limitó erróneamente la duración de las cláusulas de continuidad. A pesar de que <u>Nogueras</u> hace referencia a toda la jurisprudencia precitada, este Tribunal determinó que el término de duración de un cargo sujeto a una cláusula de continuidad "se extendería hasta que su sucesor tome posesión del cargo[,] **pero nunca después de finalizada la próxima sesión legislativa siguiente a dicha expiración**". (Negrillas suplidas). Íd., págs. 652-653. En consecuencia, concluyó que, de no confirmarse un nombramiento antes de que tal término expire, "el cargo quedaría vacante hasta tanto ambos poderes descarguen su obligación constitucional de nombramiento". Íd., pág. 653.

Esta interpretación estuvo guiada por el interés de conservar "el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la

Legislativa".[5] Íd., pág. 652. **Nada más lejos de la realidad.** Veamos.

### III

La controversia aquí planteada se circunscribe a determinar si el Gobernador puede realizar nombramientos de receso para cubrir los cargos de la presidencia de la CEE, los cuales, según adelanté, están cobijados por una cláusula de continuidad indefinida.

En virtud del recurso de certificación intrajurisdiccional, el Lcdo. Nelson Rosario Rodríguez, Comisionado Electoral del partido Proyecto Dignidad, nos informa que el 30 de junio de 2021 vencieron los términos del Presidente, Hon. Francisco Rosado Colomer, y de la Presidenta Alterna, Hon. Jessika Padilla Rivera. Añade que, el 18 de noviembre de 2021, se levantó la segunda Sesión Ordinaria en la Legislatura sin que se hubiera nombrado a sus sucesores. Por consiguiente, solicitó que, de conformidad con Nogueras v. Hernández Colón, supra, decretáramos vacantes tales cargos.

Según indiqué, el fundamento utilizado en Nogueras v. Hernández Colón, supra, para justificar la limitación impuesta a las cláusulas de continuidad es erróneo, por lo que no se justifica que perpetuemos su uso. La indefinición

_____

[5]Asimismo, el fundamento para ello estuvo predicado en la extrapolación a este contexto de la norma pautada en Hernández Agosto v. López Nieves, 114 DPR 601 (1983), donde se equiparó el límite impuesto a los interinatos al dispuesto en la Constitución a los nombramientos de receso.

en el término de duración de una incumbencia <u>holding over</u>, contrario a lo aducido en <u>Nogueras</u>, no atenta contra el equilibrio que intenta mantener nuestra Constitución en lo que respecta al poder de nombramiento compartido entre los Poderes Políticos. **Es, precisamente, todo lo contrario.**

Basados en esa premisa equivocada, el dictamen emitido por el Tribunal en <u>Nogueras</u> tuvo dos (2) consecuencias nocivas, a saber: "**[1]** aumentó indebidamente, y como cuestión de derecho constitucional, el poder del Gobernador frente al Senado en el ejercicio de la facultad de nombramientos[,] y **[2]** modificó o revocó <u>sub silentio</u> los principales precedentes que el propio tribunal citó".[6]

No podemos prolongar el desbalance surgido tras <u>Nogueras</u> y, mucho menos, volver a errar al interpretar las prerrogativas de nombramiento que comparten los dos (2) Poderes en cuanto a la continuidad de un cargo se refiere.

La limitación jurisprudencial que hoy rectificamos corrige la inclinación indebida de la balanza a favor del Poder Ejecutivo y, más importante aún, vindica la disminución a las prerrogativas del Senado en cuanto al poder de nombramientos se refiere. Ello, pues, la inclusión de una cláusula de continuidad indefinida en una ley representa una defensa a la preferencia del Senado a "sostener en su cargo a una persona a quien una vez confirmó[,] pero cuyo término ha expirado, hasta que pueda

---

[6]Álvarez González, <u>supra</u>, pág. 703.

pasar [juicio] sobre su nuevo nombramiento o sobre el nombramiento de su sucesor **y evitar con ello que el Gobernador lo sustituya haciendo un nombramiento de receso provisional**". (Negrillas suplidas). <u>González v. Corte</u>, supra, págs. 167-168.

Así pues, reiteramos que el Poder Ejecutivo está vedado de nombrar en receso al sucesor de un funcionario cuyo término fijado en ley caducó, pero que está cobijado por el periodo garantizado por la cláusula de continuidad. De lo contrario, se vulnerarían los dos (2) principales propósitos de las cláusulas de continuidad indefinida: (1) **retener en el cargo a la persona que ha sido nombrada con el consejo y consentimiento del Senado** hasta que los Poderes Políticos puedan concurrir en volver a nombrar o elegir a su sucesor, y (2) **evitar las vacantes que la ley aborrece**, toda vez que entorpecen la administración de los asuntos públicos. (Negrillas suplidas). <u>González v. Corte</u>, supra, pág. 165.

Con estas consideraciones en mente, nos parece claro que ambos propósitos vindican intereses institucionales de primer orden por parte del Senado y del Gobierno, quienes, en conjunto, alteraron sus prerrogativas de nombramiento y dotaron de un carácter continuo a la presidencia de la CEE con el propósito evitar las vacantes hasta tanto sus sucesores sean nombrados.

Precisamente, lo pautado hoy por este Tribunal salvaguarda esos intereses institucionales.No menos

importante, garantiza que se retenga a los funcionarios que fueron nombrados según el esquema de nuestro ordenamiento y se evitan vacantes en una entidad gubernamental en la que el vacío en la presidencia entorpecería la continuación de la administración de los asuntos públicos de la CEE. Ello, máxime ante la estructura de esta entidad, en la que la Presidencia y Presidencia Alterna son los únicos componentes principales que no son nombrados por los partidos políticos que la componen.

**Es evidente, entonces, que el equilibrio que pretende mantener la Constitución en cuanto a nombramientos se refiere, favorece que un funcionario continúe ejerciendo un cargo en virtud de una cláusula de continuidad indefinida vis à vis el caso de un nombramiento de receso que, por su naturaleza suplementaria, sólo puede ser ejercido unilateralmente por el Gobernador cuando existe una vacante real sobre un puesto que no contiene una cláusula de continuidad.**[7] Betancourt v. Gobernador, supra, 438, (Sentencia) (Opinión concurrente del Juez Asociado señor Alonso Alonso). Este favorecimiento, claro está, responde a que, en esa primera instancia, el funcionario en cuestión goza del sello de aprobación de los Poderes Políticos, lo que no ocurre con el nombramiento de receso.[8]

---

[7]Álvarez González, supra, págs. 703-704.

[8]A tales efectos, el profesor José Julián Álvarez González, expresa que:

> Mediante la inclusión de una cláusula de continuidad[,] el legislador se

De hecho, recientemente en Senado v. Tribunal Supremo de Puerto Rico, supra, controversia en la cual decretamos la inconstitucionalidad de la facultad delegada a este Tribunal en la selección y nombramiento de la presidencia de la CEE, destacamos que:

> Por último, esta decisión no crea problema alguno en la administración de la CEE. Nuestra intervención nunca ha sido necesaria. **Mientras los Poderes Ejecutivo y Legislativo no lleguen a un acuerdo, los incumbentes permanecerán en el cargo hasta que los sucesores sean nombrados y tomen posesión**. (Negrillas y énfasis suplido). Íd., pág. 24 (citando al Art. 3.7(2) del Código Electoral de 2020, supra).

Allí, además de destacar el equilibrio dinámico que debe imperar entre los Poderes del Gobierno durante el proceso de nombramiento con el fin de evitar que alguna de ellas amplíe su autoridad más allá de sus límites, singularizamos que:

> [U]na vez el Ejecutivo nomine a ciertos candidatos y transcurra el término que goza la Rama Legislativa para actuar, el primero mant[iene] la facultad de referir nuevos nominados para la consideración de esta última. **De esta manera, se preserva el poder constitucional del Gobernador de continuar nominando recurrentemente a otros candidatos hasta alcanzar el**

> asegura de que el primer ejecutivo tendrá que contar con el Senado para hacer un nombramiento, es decir, tendrá que utilizar "el medio primario" de nombramientos.

Íd., pág. 706 esc. 321, 703-704.

**consejo y consentimiento del Senado.**
(Énfasis en el original). Íd., pág.
35. (Opinión de conformidad emitida
por el Juez Asociado señor Estrella
Martínez).

Véase cómo destacamos que el Gobernador mantendría el poder de continuar nominando recurrentemente. Ello, evidentemente, subordinado al consejo y consentimiento del Senado. Por tanto, la facultad y el deber del Ejecutivo de enviar nombramientos recurrentemente para que el Senado le imparta su consejo y consentimiento es un proceso paralelo que no puede derogar el mandato legislativo previo de que opere la cláusula de continuidad, hasta tanto el sucesor sea confirmado y tome posesión de su cargo.

Como complemento de lo previamente pautado, el dictamen de este Tribunal servirá para que cada Gobernante venidero, al igual que los Poderes Legislativos futuros, tengan que respetar la continuidad de la administración pública en entidades cuya naturaleza obligó a legislar nombramientos a término con cláusulas de continuidad indefinidas, en caso de que no exista la confluencia de voluntades para realizar un nuevo nombramiento.

## IV

**Los propósitos de una cláusula de continuidad indefinida tienen preeminencia sobre el deseo de cualquier gobernante de nombrar en receso.** Ello, en el caso de la CEE, cobra aún más relevancia, ya que abona a la estabilidad y al carácter continúo exigido a esta institución, lo cual se logra sólo mediante la retención en sus cargos del

Presidente y la Presidenta Alterna, quienes, en virtud de la cláusula de continuidad indefinida, ostentarán sus puestos hasta que sus sucesores sean nombrados y tomen posesión del cargo.

Particularmente, **la cláusula de continuidad contenida en los cargos a la Presidencia y Presidencia Alterna de la CEE le brinda estabilidad a la administración del sistema electoral.** Los Poderes Políticos tienen la llave para cerrar esa puerta mediante el ejercicio sabio de sus respectivos poderes. Ante la incertidumbre de si ese ejercicio bilateral ocurrirá, no podemos validar que uno de los Poderes, unilateralmente, recurrentemente nombre en receso a funcionarios a la presidencia de la CEE. **Mucho menos se deben decretar unilateralmente dos (2) vacantes en la Presidencia y la Presidencia Alterna de la CEE.**

El sistema electoral de Puerto Rico y su administración no deben ser rehenes de las negociaciones entre los Poderes Políticos. Ante ello, la cláusula de continuidad otorga una protección para evitar que cualquiera de los dos entes de los Poderes Políticos persiga utilizar estrategias que disloquen el balance de poderes delineado en nuestro ordenamiento.

En consecuencia, a la luz de los fundamentos expuestos, estoy conforme con la Opinión mayoritaria.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| **Nelson Rosario Rodríguez,** en su carácter oficial de Comisionado Electoral del partido Proyecto Dignidad<br><br>Peticionario<br><br>v.<br><br>**Hon. Francisco Rosado Colomer; Hon. Jessika Padilla Rivera**<br><br>Recurridos<br><br>**Vanessa Santo Domingo,** en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP); **Ramón A. Torres Cruz,** en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); **Roberto Iván Aponte Berríos,** en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); **Lillian Aponte Dones,** en su carácter de Comisionada Electoral del Partido Movimiento Victoria Ciudadana (MVC), y el **Hon. Pedro Pierluisi Urrutia,** en su carácter de Gobernador de Puerto Rico<br><br>Partes con Interés | CT-2021-14 |

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente.


En San Juan, Puerto Rico, a 27 de diciembre de 2021.


Una mayoría ignora los precedentes que rigen nuestro ordenamiento jurídico en cuanto a la separación de poderes y, sin más, da al traste con preceptos cardinales que la Convención Constituyente, con suma sabiduría, instituyó en

Puerto Rico. Apenas hace unos meses, en Senado v. Tribunal Supremo y otros, 2021 TSPR 141, 208 DPR ___ (2021), defendimos, de manera férrea, el mismo principio constitucional que hoy la mayoría hace sal y agua. Tal actuación posiciona -en un rango de poder insostenible- cláusulas de continuidad estatutarias ajenas a nuestro sistema democrático y constitucional.

Lo expreso con respeto, pero con igual convencimiento, la posición mayoritaria no tiene base en nuestro derecho positivo y constitucional. De hecho, en ninguna parte se identifica el anclaje legal que autoriza a que funcionarios con términos vencidos se mantengan en sus cargos —de forma indefinida— so color de cláusulas de continuidad estatutarias. Preocupa, pues tal actuación expone al pueblo de Puerto Rico a un sistema que fomenta comportamientos eminentemente antidemocráticos.

Desde hoy, si el gobernador o la gobernadora de turno opta por no nombrar a una persona que ocupa un puesto amparándose en una cláusula de continuidad, la Asamblea Legislativa está a su merced. Personas que ocupen puestos gubernamentales, cuyos términos vencieron, podrán ejercer sus funciones a espaldas del aval democrático del máximo representante del pueblo: la legislatura. Ello, sostengo con respeto, parece avalar principios más afines con regímenes absolutistas, que los baluartes democráticos que estamos llamados a proteger.

El temor infundado de no afectar el flujo de los trabajos administrativos en la Comisión Estatal de Elecciones (CEE) no puede dar pie a trastocar el sistema de pesos y contrapesos que estableció nuestra Constitución hace más de 70 años. Tampoco puede ser la justificación para que ahora a una persona pueda permanecer, *ad infinitum*, en un cargo cuyo nombramiento nunca pasó, ni obtuvo, el aval de la Asamblea Legislativa. Preocupa todavía más que esta decisión trasciende el nombramiento actual de la cabeza de la CEE y tiene el potencial de impactar el universo de los nombramientos.

Ello no debió ocurrir. El Tribunal Supremo se instituyó para velar por que todas las leyes de Puerto Rico se subordinen a la constitución y, en consecuencia, al principio de separación de poderes. Por todo lo anterior, disiento.

La opinión mayoritaria narra los hechos como corresponde, por lo que, a continuación, explico las razones de mi disenso.

## I.

En Puerto Rico existen dos tipos de cláusulas de continuidad: (1) las que son de rango constitucional y (2) las que son de carácter estatutario.[1] El objetivo de las cláusulas

---

[1] Para un ejemplo de cláusula de continuidad de rango constitucional véase el Art. III, Sec. 22, Const. PR, LPRA, Tomo 1, establece que: "[h]abrá un Contralor que será nombrado por el Gobernador con el consejo y consentimiento de la mayoría del número total de los miembros que componen cada Cámara. El Contralor reunirá los requisitos que se prescriban por ley; desempeñará su cargo por un término de diez años y hasta que su sucesor sea nombrado y tome posesión". Sin lugar a duda, la cláusula de continuidad de carácter constitucional cumple con el objetivo de la Asamblea Constituyente de autorizar que dichos funcionarios sigan ejerciendo su cargo constitucional luego de que venciera el término dispuesto constitucionalmente. Lo mismo no ocurre con las cláusulas de

de continuidad de rango constitucional es asegurarse que el funcionario que ocupe dicho cargo continúe en este al finiquitar el periodo para el cual fue designado. En ese sentido, no se violenta la separación de poderes porque la propia constitución, en su inmensa sabiduría, dispuso que una persona que ocupa dicho cargo constitucional se mantenga en funciones hasta que los demás poderes políticos decidan quién será el sustituto.

Las cláusulas de continuidad estatutarias tienen un alcance distinto. Este Tribunal las ha analizado a través de los años y en distintos momentos históricos. Es importante estudiar y distinguir los precedentes que citó la opinión de la mayoría de este Tribunal en miras de revocar Nogueras v. Hernández Colón, 127 DPR 638 (1991) (*Per Curiam*) (en adelante, Nogueras II). De entrada, la opinión que emite el Tribunal hoy resalta el caso de González v. Corte, 62 DPR 160 (1943), para mencionar que las cláusulas de continuidad tienen dos (2) propósitos, a saber:

> (1) retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor; (2) evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de

---

continuidad estatutarias que carecen del peso de la constitución y que deben quedar subordinadas al principio rector y constitucional a la separación de poderes. Para ejemplos de cláusulas estatutarias tenemos el Art. 3.7 del Código Electoral de 2020, 16 LPRA sec. 4517; el Art. 2.2 de la Ley de Ética Gubernamental de Puerto Rico de 2011, Ley Núm. 1-2012, 3 LPRA sec. 1855a; el Art. 10(3) de la Ley de la Oficina del Panel sobre el Fiscal Especial Independiente, Ley Núm. 2 de 23 de febrero de 1988, 3 LPRA sec. 99q ; el Art. 4 de la Ley Núm. 20-2001, conocida como la Ley de la Oficina de la Procuradora de las Mujeres, 1 LPRA sec. 31.

los asuntos públicos. González v. Corte, supra, pág. 165.

Para comprender la fuerza de estas expresiones es necesario contextualizarlas. Este caso se dilucidó en el 1943, es decir, en una época preconstitucional. Allí, el Tribunal tuvo que resolver si el Gobernador podía realizar un nombramiento de receso a favor de una persona distinta para el cargo de un juez municipal, cuyo término de cuatro años venció mientras el Senado estaba en receso. En ese momento histórico, en Puerto Rico regía la Ley Jones de 1917, Pub.L. 64-368, 39 Stat. 951, y no la Constitución que ahora interpretamos. Este Tribunal, por medio de un recuento de los orígenes históricos de la separación de poderes, dijo que a pesar de que el Senado se creó en 1917 por el Acta Jones-Shafroth:

> [E]l poder legislativo, en su totalidad, quedó sujeto a tales cortapisas que no era razonable pensar que éste pudiese podar las facultades del gobernador nombrado por la metrópoli. **Era una asamblea legislativa trunca, sin el poder de frenar eficazmente el del gobernador** mediante la facultad de aprobar legislación a pesar de su veto. **La decisión final en casos de tales choques entre el poder legislativo y el ejecutivo se confiaba al presidente. Tampoco puede afirmarse con rigor histórico que nuestro ordenamiento constitucional encarnaba en modo amplio la doctrina de la separación de poderes.** Hernández Agosto v. López Nieves, supra, pág. 619. (Negrillas suplidas)

Todo lo anterior indica que el análisis de las cláusulas de continuidad estatutarias surgidas con anterioridad a la constitución de Puerto Rico debe de examinarse de manera puntillosa. Sobre todo, cuando el ordenamiento vigente al momento de hacerse dichas expresiones no es el mismo que el actual. Debo señalar que en 1943 el gobernador no era electo

por los puertorriqueños, sino, nombrado por el Presidente de los Estados Unidos, y el Senado de Puerto Rico no era realmente una fuerza representativa del poder constituyente.[2] Ello mina el análisis analógico que se pueda realizar, pues mucho ha sucedido desde 1943 hasta 2021. Sobre todo cuando dichas expresiones no se realizaron teniendo en mente el actual sistema de separación de poderes.

Luego, la opinión mayoritaria se ampara en López v. Tribunal Superior, 79 DPR 20, 23 (1956) (haciendo referencia a González v. Corte, supra, págs. 164-165; Acosta v. Corte, 63 DPR 651 (1944)), para resaltar que las cláusulas de continuidad estatutarias evitarían el resultado de que por un periodo de tiempo exista una vacante. Nuevamente, es necesario destacar que dicho caso se resolvió bajo un ordenamiento jurídico preconstitucional. Los hechos que provocaron la controversia ocurrieron en 1949, previo al establecimiento y desarrollo de la actual doctrina de separación de poderes. Incluso, de una lectura de ese caso, no surge que se invocase el principio de separación de poderes constitucional para resolver la controversia. Por el contrario, se citó jurisprudencia preconstitucional pues se atendía una controversia que surgió con anterioridad al establecimiento de nuestra constitución.

---

[2] La Carta Orgánica de 1900 (Acta Foraker), 31 Stat. 81 establecía que el gobernador era un funcionario no electo nombrado por el Presidente de Estados Unidos y confirmados por el Senado federal. Íd., Secs. 17 y 18. El Acta Jones-Shafroth de 1917 mantuvo dicho sistema. No es hasta la aprobación de la Ley del Gobernador Electivo, 61 Stat. 771, que el Congreso de los Estados Unidos autorizó que Puerto Rico eligiese democráticamente al primer mandatario del Poder Ejecutivo.

Ulteriormente, la mayoría cita <u>J.R.T. v. Milares Realty, Inc.</u>, 90 DPR 844, 858-859 (1964), para indicar que, en ausencia de una cláusula de continuidad, el cargo de un funcionario público se encontraba vacante al finalizar su término. Sin embargo, esa no fue la controversia medular que este Tribunal atendió en ese caso. Lo que se evaluó fue el argumento de una de las partes en cuanto a que no existía legalmente una Junta de Relaciones del Trabajo, por cuanto uno de los cargos de la Junta estaba vacante y sin incumbente. Resolvimos dicha controversia acudiendo a la Ley de Relaciones del Trabajo, que en su Art. 3, Ley Núm. 130 de 1945 según enmendada, disponía "una vacante en la Junta no menoscaba el derecho de los miembros restantes a ejercer los poderes de la misma, y que dos de sus miembros constituirán quórum". <u>Íd.</u> Lo mencionado sobre la cláusula de continuidad en el caso no fue esencial para resolver la controversia, por lo que se puede catalogar como *obiter dictum*.[3] Es decir, no

---

[3] En el pasado enunciamos que el término *obiter dictum* es de aplicación "cuando un tribunal emite expresiones innecesarias en un caso o una controversia ante sí, y acerca de interrogantes jurídicas que, propiamente, no le han sido planteadas. **Tratándose de expresiones no directamente relacionadas con la controversia planteada, éstas no sientan precedente jurídico alguno**". <u>Ortiz v. Panel F. E. I.</u>, 155 DPR 219, 252(2001) (citas depuradas y Negrillas suplidas). Véanse, además, <u>Martínez v. Registrador</u>, 54 DPR 7 (1938); <u>P.G.R.R. Co. v. Antonetti et al.</u>, 17 DPR 325 (1911). Asimismo, dijimos que:
> [E]l concepto obiter dictum presupone, según definido, que el tribunal ponente tiene ante sí un caso real y una controversia justiciable; un obiter dictum sólo implica que, al resolver, el tribunal incurre en pronunciamientos innecesarios sobre otros asuntos que no están en controversia **o que no le han sido propiamente planteados en el caso.** A diferencia de una opinión consultiva, **el obiter dictum emitido por un tribunal simplemente se debe tener por no puesto, ya que no constituye parte necesaria del fallo, sino que muchas veces son meras expresiones judiciales excesivas e innecesarias.** <u>Ortiz v. Panel F. E. I.</u>, supra, págs. 252-253. (Negrillas suplidas).

tiene el alcance que la opinión que se emite hoy pretende otorgarle.

A base del marco jurisprudencial reseñado, la opinión mayoritaria cuestiona la conclusión a la que este Tribunal llegó en Nogueras II. Como vimos, los precedentes en los que se fundamenta la mayoría del Tribunal para afirmar que **"Nogueras II no tiene espacio en nuestra jurisprudencia y queda hoy revocado"** no se enmarcaron en el mismo contexto histórico de Nogueras II ni en el ordenamiento constitucional vigente actualmente. Opinión mayoritaria, pág.17.

Distinto a los precedentes citados por la mayoría, Nogueras II se analizó al amparo de la doctrina de separación de poderes elaborada a partir de la interpretación constitucional de los poderes de nombramiento del Ejecutivo y de consejo y consentimiento del Legislativo. Después de todo, la constitución puertorriqueña imprimió un sello particular a la separación de poderes.

En Nogueras II enunciamos que el hecho de mantener a determinados jueces y juezas con nombramientos vencidos en sus cargos de manera indefinida al amparo de una cláusula de continuidad estatutaria violaba el fino balance que intenta mantener nuestra Constitución sobre el ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa. Nogueras II, supra, pág. 651. Es decir, allí resolvimos a la luz de la doctrina de separación de poderes de nuestra constitución y no al amparo de la débil doctrina esbozada bajo la Ley Jones.

En aquella ocasión examinamos la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 11 de 24 de julio de 1952, 4 LPRA secs. 92 y 152(c), y la Ley sobre Jueces Municipales, Ley Núm. 7 de 8 de agosto de 1974, 4 LPRA sec. 211. Por una parte, la Ley de la Judicatura vigente en ese momento disponía que "[t]odo juez será nombrado y desempeñará su cargo por el término de doce (12) años y **hasta que su sucesor tome posesión de su cargo**" mientras que la ley sobre los jueces municipales decía que "[s]e crea el cargo de Juez Municipal. […] Estos serán nombrados por el Gobernador, con el consejo y consentimiento del Senado, por un término de cinco (5) años **hasta que su sucesor sea nombrado y tome posesión de su cargo**". (Negrillas suplidas).[4]

En ambas legislaciones, el juez o la jueza podía estar en el cargo hasta que su sucesor fuese nombrado y tomase posesión. Lo anterior cambió con Nogueras II, supra, págs. 651-652, donde este Tribunal expresó que "[l]a indefinición en el término de duración de una incumbencia holding over atenta contra el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa". Nogueras II, supra, pág. 651. Allí, criticamos seriamente la indefinición del término pues esta "abona el terreno para que

---

[4] Cf. Art. 3.7 del Código Electoral de 2020, supra:

El Presidente y el Alterno al Presidente serán nombrados no más tarde del primero (1ro) de julio del año siguiente a una elección general. El término para los cargos antes mencionados será de cuatro (4) años a partir de esa fecha, **hasta que los sucesores sean nombrados y tomen posesión del cargo.** (Negrillas suplidas).

se produzca una situación en la que se trastoque el firme equilibrio deseado a la hora de extender nombramientos que requieran consejo y consentimiento del Senado". Íd.

El desequilibrio que advertimos en Nogueras II, impacta tanto al Poder Ejecutivo como al Legislativo. Analizamos, por ejemplo, que "[l]a Rama Legislativa podría imponerle su criterio al Ejecutivo con tan sólo rechazar, por acción o inacción --cuando aquella esté en sesión-- la sustitución hecha por [e]ste de un incumbente cuyo nombramiento ha expirado" por lo que se violentaría "el poder que le corresponde al Ejecutivo en la función de nombrar". Íd. Dichas expresiones se encuentran fundamentadas en una sana interpretación de la doctrina constitucional de la separación de poderes.

Por otro lado, advertimos también que "[s]i el Ejecutivo desea que un incumbente en un cargo con cláusula de continuidad permanezca en el mismo indefinidamente sin que la Legislatura se exprese sobre su confirmación para un nuevo término, lo único que tiene que hacer es no enviar nombramiento alguno a la Legislatura". Íd. Tampoco avalamos tal proceder porque lo anterior produciría una burla a "la función constitucional del Senado en la participación de los procesos de nombramiento y confirmación". Íd.

Todo lo anterior, se fundamentó en el principio constitucional de separación de poderes. Mismo principio que tan reciente como en Senado v. Tribunal Supremo y otros, 2021 TSPR 141, 208 DPR ___ (2021) defendimos vehementemente. En

dicho caso dijimos que la aspiración de la separación de poderes es enunciar las responsabilidades de las tres ramas constitucionales que componen el Estado Libre Asociado de Puerto Rico. Es decir, nuestra Asamblea Constituyente se aseguró de que ninguno de los tres poderes constitucionales se sobreponga y domine indebidamente a otro.

La razón de ser de la separación de poderes es proteger la libertad de los ciudadanos y salvaguardar la independencia de cada poder del Gobierno. Acevedo Vilá v. Meléndez Ortiz, 164 DPR 875, 882-883 (2005). Hemos expresado que:

> La relación entre los poderes del Gobierno debe ser una dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya un conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias. Sánchez et al. v. Srio. de Justicia et al., 157 DPR 360, 386 (2002), citando a Silva v. Hernández Agosto, 118 DPR 45, 57 (1986).

En Senado v. Tribunal Supremo y otros, supra, señalamos que, al momento de atender una controversia bajo la doctrina de separación de poderes, es necesario determinar si "en la operación real del sistema y en un contexto histórico determinado **el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución**". Citando a Nogueras v. Hernández Colón I, 127 DPR 405, 426 (1990).

La misma composición de <u>Nogueras v. Hernández Colón I</u>, supra, resolvió <u>Nogueras II</u> al amparo de la doctrina de separación de poderes. La conclusión de <u>Nogueras II</u> tuvo el objetivo de evitar la acumulación de poder indebida en los poderes constitucionales y al mismo tiempo impedir un resultado incompatible con el ordenamiento político de nuestra Constitución. El malestar social y constitucional que <u>Nogueras II</u> evitó es el que de ahora en adelante viviremos como comunidad política

En <u>Nogueras II</u>, el Tribunal razonó que era imperativo, bajo nuestra constitución y su doctrina de separación de poderes, limitar el término de duración del período posterior a la expiración del término del incumbente (holding over). Por ello, decidió que el mismo se extiende "hasta que [el] sucesor tome posesión del cargo, pero nunca después de finalizada la próxima sesión legislativa siguiente a dicha expiración". <u>Íd</u>. pág. 653. Por consiguiente, se resolvió que, si el Poder Ejecutivo y Legislativo "no logran llegar a un acuerdo sobre la renominación del incumbente o su sucesor antes de finalizada la sesión ordinaria señalada, el cargo quedaría vacante hasta tanto ambos poderes descarguen su obligación constitucional de nombramiento". <u>Íd</u>. Dicha conclusión es la más razonable si tenemos como norte el estatus que tiene la doctrina republicana de separación de poderes en nuestro país. Resolver lo contrario, como hace la opinión mayoritaria, es sobreponer la continuidad y el status

quo frente a la lógica inescapable de un sistema de pesos y contrapesos.

La opinión que se certifica hoy pretende descartar Nogueras II porque, entre otras razones, hubo opiniones disidentes. Ahora bien, el disenso del Juez Asociado señor Negrón García, citado en la opinión mayoritaria, reconoce "que el único fundamento en que se funda la mayoría para la nueva visión sobre la cláusula de continuidad **es el 'poder compartido' entre el Ejecutivo y el Senado**, expuesto en Hernández Agosto v. López Nieves, supra". Opinión mayoritaria, pág. 15 citando a Nogueras II, supra, pág. 686. (Negrillas suplidas). ¿Qué indica que el fundamento principal de Nogueras II sea el poder compartido entre los dos poderes políticos? A primera instancia, parecería que el fundamento, reconocido por la propia opinión disidente que cita la mayoría, es el poder de nombramiento del gobernador o gobernadora y el consejo y consentimiento que emana de la legislatura. Lo anterior no nos puede distraer del verdadero fundamento: la separación de poderes. Hace dos meses dijimos que "[l]a cláusula de nombramientos está estrechamente vinculada a la doctrina de separación de poderes". Senado v. Tribunal Supremo y otros, supra, pág. 9. ¿Cómo no va a estarlo? El balance de poderes es la razón de ser de tan protegida doctrina constitucional.[5] La interpretación del

---

[5] Raúl Serrano Geyls explica que:
    [l]a distribución entre el Congreso y el Ejecutivo del poder para efectuar nombramientos es uno de los ejemplos más claros de los esfuerzos de los forjadores de la Constitución por incorporar a ese documento un delicado sistema de frenos y contrapesos consecuente con su particular visión de la teoría

balance de poderes que se realiza en Nogueras II es el fundamento que altera la visión preconstitucional de las cláusulas de continuidad estatutarias.

Cabe resaltar que en múltiples instancias hemos reafirmado el precedente de Nogueras II.[6] Sobre todo, debemos destacar Bomberos Unidos v. Cuerpo Bomberos, 180 DPR 723, 765 (2011) donde una mayoría del actual Tribunal, cuya composición apenas ha cambiado desde ese momento, reafirmó la doctrina de Nogueras II. Allí, la misma mayoría que hoy rechaza Nogueras II, lo citó con autoridad y dijo:

> Cuando un empleado de carrera rinde servicios temporeros en calidad de interinato, asume el cargo superior con todas las obligaciones, responsabilidades y facultades que dicho cargo conlleva. Ahora, en cargos que requieran el consejo y consentimiento del Senado, el interinato queda sin efecto "'**al levantarse la sesión ordinaria de la Asamblea Legislativa en curso o, en su defecto, la siguiente, al comienzo del interinato, a menos que se efectúe antes del nombramiento en propiedad'** .... **Esa y no más es la expectativa de continuidad que puede tener un funcionario incumbente bajo una cláusula de continuidad**". Nogueras v. Hernández Colón, 127 DPR 638, 652 (1991). Bomberos Unidos v. Cuerpo Bomberos, supra, págs. 764-765. (Negrillas suplidas).

A diferencia de los casos que cita hoy la opinión dictada, que son preconstitucionales u *obiter dictum*, en Bomberos Unidos v. Cuerpo de Bomberos, supra, este Tribunal abrazó Nogueras II como un precedente vital para la resolución de dicho caso.[7] Además, en Misión Ind. P.R. v. J.P., 146 DPR

---

de separación de poderes. Raúl Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 605.

[6] Véase Senado v. Tribunal Supremo, supra, pág. 22; Nieves Huertas v. ELA I, 189 DPR 611, 620, (2013) (sentencia).

[7] La mayoría dijo en Bomberos Unidos, supra, como parte de la aplicación de Nogueras II, lo siguiente:

64, 92 (1998) reafirmamos la doctrina de Nogueras II y dijimos que las cláusulas de continuidad estatutarias e indefinidas "violaba[n] "el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido entre la Rama Ejecutiva y la Legislativa". Igual pronunciamiento hicimos en In re Vargas Soto, 146 DPR 55, 92 (1998). En Brunet Justiniano v. Hernández Colón, 130 DPR 248, 257 (1992) explicamos que Nogueras II "limitó el término de la "cláusula de continuidad" a la finalización de la próxima sesión ordinaria de la Asamblea Legislativa siguiente a la expiración del nombramiento".

Borrar de un plumazo una jurisprudencia sostenida en el principio constitucional a la separación de poderes con jurisprudencia anterior y preconstitucional es un error. Más aún, cuando no se realiza un análisis sosegado de la doctrina de *stare decisis* ni de la doctrina de separación de poderes.[8]

---

Como mencionamos anteriormente, todo empleado público de carrera en un puesto cuya clasificación es superior a la del puesto para el cual tiene nombramiento oficial ejerce ese puesto superior en calidad de interinato. Así, cuando el empleado asume el cargo en calidad de interinato, también asume todas las obligaciones, responsabilidades y facultades que dicho cargo conlleva. Este interinato no podrá subsistir más allá del final de la sesión legislativa siguiente a la fecha en que se produjo la vacante que se llenó mediante el interinato. **Nogueras v. Hernández Colón**, supra. Bomberos Unidos v. Cuerpo Bomberos, supra, págs. 772-773. (Negrillas suplidas).

[8] La doctrina de stare decisis dispone que, como norma general, un tribunal debe acatar sus decisiones anteriores en los casos que resuelva posteriormente. Su objetivo es "lograr estabilidad y certidumbre legal". Pueblo v. Díaz De León, 176 DPR 913, 921 (2009). La Corte Suprema de los Estados Unidos dijo en Payne v. Tennessee, 501 US 808, 827 (1991) que "[s]tare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process". Hemos identificado tres circunstancias excepcionales que justifican revocar un precedente: "(1) si la decisión anterior es claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". Pueblo v. Díaz De León, supra, pág.

La opinión mayoritaria no tan solo revoca <u>Nogueras II</u> incorrectamente, sino que lo hace sin realizar un análisis sustantivo y concienzudo de los fundamentos jurídicos constitucionales que se expresaron y consideraron en dicho caso.[9]

Independientemente de lo que unos académicos puedan pensar sobre la corrección de la decisión, <u>Nogueras II</u> brinda una confianza enorme y razonable al momento de interpretar la doctrina de separación de poderes. Por supuesto que hay circunstancias que ameritan y exigen revocar decisiones pasadas. No obstante, existe una presunción de que debemos seguir los precedentes y que dicha presunción se debe rebatir mediante un razonamiento jurídico claro y coherente. Cuando se quiere derogar un precedente con evidente impacto en el

---

922 (citando a Pueblo v. Camacho Delgado, 175 DPR 1, 20 esc. 4 (2008)). Sin lugar a duda, como veremos más adelante, la decisión anterior no es claramente errónea dado que se sustenta en una interpretación constitucional de la doctrina de separación de poderes. El efecto de <u>Nogueras II</u> no es adverso, por el contrario, garantiza que el pueblo de Puerto Rico tenga un sistema de pesos y contrapesos donde los poderes políticos, representantes del pueblo, tienen que negociar por el mejor bienestar del país. Revocar <u>Nogueras II</u> incentiva conductas perversas como describimos anteriormente. Por último, la cantidad de personas que confían en <u>Nogueras II</u> no es limitada, al contrario, es vasta porque como muy bien indica la opinión mayoritaria, múltiples funcionarios tienen cláusulas de continuidad estatutarias.

[9] Vale resaltar, además, que la Mayoría no atendió detenidamente cuestionamientos válidos que presentaron las partes con relación a la jurisdicción del Tribunal. Específicamente, y de vital importancia, omitió discutir las alegaciones del Procurador General en cuanto a la legitimación activa del demandante y la insuficiencia en el emplazamiento del Presidente y Presidenta Alterna de la CEE. Según el Procurador General, para que ese emplazamiento fuera válido, el demandante tenía que emplazar al Secretario de Justicia, lo que no ocurrió en este caso. Asimismo, cuestionó que una persona en su carácter oficial como Comisionado Electoral tuviera legitimación activa para impugnar la permanencia del Presidente y la Presidenta Alterna de la CEE en sus cargos. Particularmente, no se discutió si el Comisionado Electoral del Proyecto Dignidad sufrió un daño claro y palpable que le confería tal legitimación; o que este estuviera facultado para vindicar los derechos y prerrogativas de la Asamblea Legislativa. La Mayoría se limitó a atender estos argumentos con un mero *no ha lugar.* Op. Mayoritaria, pág. 18, esc. 12.

sistema político y democrático de Puerto Rico, se tiene la obligación de brindar una explicación razonable.

III

Por ende, es prudente y forzoso colegir que una interpretación literal de la cláusula de continuidad estatutaria del art. 3.7 del Código Electoral de Puerto Rico no puede prevalecer pues:

> Tal interpretación choca abiertamente con la doctrina de separación de poderes ínsita en la cláusula de nombramientos de nuestra Constitución. **Admitir que un funcionario público --cuyo nombramiento a un cargo sea con cláusula de continuidad-- pueda permanecer indefinidamente en el puesto por todo el tiempo que pueda concebiblemente tomarle a los mencionados poderes ponerse de acuerdo en cuanto a un nuevo nombramiento tendría el efecto de dar rienda suelta a cualquiera de dichos dos (2) poderes para perpetuar en su puesto a un incumbente cuyo término ha expirado, en contravención al criterio del otro respecto a las cualidades o ejecutorias de dicho incumbente**. Nogueras v. Hernández Colón II, supra, pág. 651. (Negrillas suplidas).

No puedo suscribir que se avale que un funcionario pueda estar en un cargo cuyo término venció, sin pasar por el consejo y consentimiento del Senado de Puerto Rico.  Nuestro esquema constitucional no lo autoriza. Mucho menos, cuando la base para ello es evitar un disloque administrativo especulativo e inexistente.

Sostengo y alerto que la opinión mayoritaria genera unos incentivos antidemocráticos. La controversia en este caso es sencilla: ¿las personas que hoy ocupan los cargos de Presidente y Presidenta Alterna de la CEE, cuyo término venció, pueden continuar ejerciendo sus funciones al amparo de una cláusula de continuidad **indefinida**? La respuesta que

proviene de la doctrina de separación de poderes, como hemos visto, es diáfana: **no**.[10]

La opinión mayoritaria peca de reduccionismo jurídico. Pretende circunscribir la presente controversia a si Nogueras II es un precedente correcto y si debe regir en este caso. Ello es un error pues no vislumbra que dicha conclusión provocará un desequilibrio entre los Poderes Ejecutivo y Legislativo. Y es que un funcionario que se mantiene ejerciendo una posición sin que se sujete al escrutinio del consejo y consentimiento del Senado, "ciertamente resultaría en un sinsentido con visos dictatoriales, completamente ajeno a nuestro Sistema Democrático de Gobierno". Senado v. Gobierno de Puerto Rico, 203 DPR 62, 170 (2019) (Opinión de conformidad del Juez Asociado señor Feliberti Cintrón).

Del mismo modo, revocar Nogueras II bajo el fundamento de mantener la continuidad operacional de la CEE y evitar un disloque administrativo no es sostenible. En primer lugar, el principio constitucional de la separación de poderes es superior a la logística o ritmo de los trabajos administrativos de cualquier agencia. De hecho, aun si diéramos por cierto que tales circunstancias sostienen el razonamiento de la mayoría, la actuación mayoritaria no hacía falta. Se sabe que ya hemos tenido que intervenir anteriormente con los disloques administrativos de la CEE

---

[10] Cabe preguntarse, si ambos poderes políticos coordinaran entre sí para procurar que una persona se mantuviera en un puesto público de manera vitalicia y con los consabidos efectos al pueblo de Puerto Rico, ¿sería constitucional? Inclusive, si ambas ramas constitucionales desearan una monarquía en Puerto Rico, ¿sería constitucional?

bajo el liderato de un Presidente. Véase Pierluisi Urrutia v. CEE, 204 DPR 841, 848 (2020) (La situación precaria de los procedimientos electorales del país fueron causa "de los **atrasos y las complicaciones administrativas producto de la crasa negligencia de los directivos de la Comisión Estatal de Elecciones (CEE)** y de las Comisiones de Primarias") (Negrillas suplidas). Es decir, con o sin Presidente y Presidente Alterno los disloques se han dado; esto es, el que los puestos estén ocupados no garantiza la continuidad exitosa, pues ya tuvimos "una administración deficiente [de un] evento electoral programado [que] dejó a miles de electores sin la oportunidad de expresar su voluntad en las urnas respecto a las primarias. Íd. pág. 863.

De igual forma, la opinión que se dicta hoy confunde la continuidad administrativa de la CEE con la necesidad de mantener una cláusula de continuidad sin límites constitucionales. Cuando la Asamblea Legislativa dispuso en la exposición de motivos del Código Electoral de 2020 que dicha agencia tiene que ser una en funcionamiento continuo, lo hizo bajo el contexto de que operaría todos los años para coordinar las elecciones que el país necesitase. La vacante de un Presidente y Presidente Alterno no crea una interrupción operacional. ¿Desde cuándo ciertos funcionarios públicos en particular son indispensables en una democracia?[11]

---

[11] Es irónico que subrepticiamente se plantee la indispensabilidad de unos funcionarios públicos cuando en todo sistema público, estatal y federal, existen múltiples ejemplos de sucesiones administrativas en los poderes que componen al Estado. Véase, e.g. Senado v. Gobierno de Puerto Rico, supra; Reglamento del Tribunal Supremo de Puerto Rico, Regla 8, 4 LPRA App. XXI-B, sec. 8; Presidential Succession Act of 1947, 61 Stat.

Proteger a <u>Nogueras II</u> no conllevaba el fin de la CEE. Había y hay alternativas que fomentan la continuidad presidencial de dicha agencia. Por ejemplo, los poderes políticos podían y deben cumplir con su deber constitucional y nombrar y confirmar, de una vez, a los sustitutos del actual Presidente y Presidente Alterno. Otra alternativa es nombrar en receso al Presidente y Presidente Alterno de la CEE.[12] Otra opción, también disponible, surge del propio Código Electoral y la organización administrativa existente a través de otras figuras como, por ejemplo, el Secretario de la Comisión Estatal.[13]

_____

380. **Cabe señalar que la cláusula de continuidad del Código Electoral de 2020 es de naturaleza distinta a la que se examinó en los casos preconstitucionales. Los nombramientos del Hon. Francisco Rosado Colomer y la Hon. Jessika Padilla Rivera se hicieron al amparo de la primera modalidad para seleccionar al Presidente y Presidente Alterno. Es decir, fueron los Comisionados Electorales los que eligieron a dichos funcionarios y no el gobernador con el consejo y consentimiento del senado. Por lo tanto, no cabe interpretar que la cláusula de continuidad estatutaria del Código Electoral de 2020 mantiene un nombramiento validado por el Senado, cuando aquí no ocurrió dicho aval.**

[12] Sobre el temor de la mayoría de que existirá una vacante, la propia constitución provee una solución:

**El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión.** Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria. Const. PR, Art. IV, Sec. 4, LPRA, Tomo 1.

[13] Aunque fueron, precisamente, modificaciones al Código Electoral como la eliminación de los puestos de carrera las que nos traen hasta aquí, <u>hoy</u> existen alternativas dentro de la estructura organizacional que no conlleva este golpe constitucional. La problemática que este caso desatiende, entre tantas otras, es qué ocurriría si, por razones fuera de la voluntad de los funcionarios que ocupasen el cargo de Presidente y Presidente Alterno, estos dejasen su cargo de manera repentina y simultánea. Bajo la premisa de la mayoría, tal cese de operaciones conllevaría que la CEE entre --automáticamente-- en un caos administrativo. Nada más lejos de la realidad. La omisión deliberada de la Asamblea Legislativa sobre quienes sustituirán dichos cargos, no impide que el derecho, y nosotros como los intérpretes últimos de la legislación, suplamos las deficiencias. Véase *cf*. art. 3.008, 16 LPRA sec. 4018, del Código Electoral de Puerto Rico para el Siglo XXI, Ley Núm. 78-2011 (derogado 2020). Así, la propia ley nos autoriza a resolver cuando existe un vacío legal: "[l]os principios generales del Derecho aplican en ausencia de ley o costumbre, sin perjuicio de su carácter informador del ordenamiento jurídico". Código Civil de 2020, art. 5, 31 LPRA sec. 5315. La equidad, como parte de los principios generales del derecho, podría utilizarse como instrumento para resolver las controversias donde no

Respaldar poderes ilimitados que autorizan que un funcionario –que nunca fue confirmado- permanezca en un cargo que venció lastima, de forma peligrosa y demasiado cerca del absolutismo, el orden democrático que juramos defender.


                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta

---

existe una clara línea sucesoria. Véase Defendini Collazo et al. v. ELA, 134 DPR 28, 50 (1993); Silva v. Comisión Indus. PR, 91 DPR 891, 896 (1965).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Nelson Rosario Rodríguez, en su carácter oficial de Comisionado Electoral del Partido Proyecto Dignidad<br><br>    Peticionario<br><br>       v.<br><br>Francisco Rosado Colomer; Jessika Padilla Rivera<br><br>    Recurridos<br><br>Vanessa Santo Domingo, en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP); Ramón A. Torres Cruz, en su carácter de Comisionado Electoral del Partido Popular Democrático PPD); Roberto Iván Aponte Berríos, en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Lillian Aponte Dones, en su carácter de Comisionada Electoral del Partido Movimiento Victoria Ciudadana (MVC), y el Hon. Pedro Pierluisi Urrutia, en su carácter de Gobernador de Puerto Rico<br><br>    Partes con Interés | CT-2021-0014 |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 27 de diciembre de 2021.

Hoy, una mayoría de mis compañeros y compañera de estrado, en una actuación en extremo lamentable, deciden revocar *expresamente* lo sentenciado hace varias décadas atrás por este Tribunal en el normativo caso *Nogueras v.*

*Hernández Colón (2)*, *infra*. Al así hacerlo, abandonan los pronunciamientos -- bien pensados, investigados y analizados -- que allí se recogen para acomodaticiamente concluir que el Presidente y la Presidenta Alterna, en funciones, de la Comisión Estatal de Elecciones pueden continuar ocupando sus cargos a la luz de cierta cláusula de continuidad dispuesta en el Art. 3.7(2) del Código Electoral de Puerto Rico de 2020, *infra*. De tan errado curso de acción, enérgicamente disentimos.

Y es que no albergamos duda alguna de que -- en virtud de lo ya resuelto por este Tribunal en *Nogueras v. Hernández Colón (2)*, *infra*, un caso anclado en una correcta interpretación de los más nobles principios que se recogen en la doctrina constitucional de separación de poderes --, el Presidente y la Presidenta Alterna de la Comisión Estatal de Elecciones, Hon. Francisco J. Rosado Colomer y Hon. Jessika D. Padilla Rivera, desde el pasado 17 de noviembre de 2021, ocupan sus cargos de forma ilegal; lo que pone en tela de juicio todas las actuaciones que, desde ese momento, éste y ésta han realizado al frente del referido organismo electoral. Flaco servicio el que se le hace al País. Veamos.

I.

Los hechos medulares que dieron margen al presente litigio no están en controversia. Allá para el 20 de junio de 2020, la entonces gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, firmó la Ley Núm. 58-2020, conocida como

*Código Electoral de Puerto Rico de 2020*, 16 LPRA sec. 4501 *et seq.* (en adelante, "Código Electoral de 2020"). Con la aprobación de este último -- y en lo pertinente a la controversia que nos ocupa --, se instauró en nuestra jurisdicción el andamiaje legal que gobierna todo lo relacionado a los nombramientos del Presidente y Presidente Alterno de la Comisión Estatal de Elecciones (en adelante, "C.E.E.").

Al respecto, y como cuestión de umbral, el Art. 3.7(2) del Código Electoral de 2020, 16 LPRA sec. 4517, dispone que los nombramientos a los cargos de referencia deben realizarse "no más tarde del primero (1ro) de julio del año siguiente a una elección general". En cuanto al término de duración para tales cargos, el precitado artículo dispone que será de cuatro (4) años a partir del primero (1ro) de julio del año siguiente a una elección general, hasta que los sucesores sean nombrados y tomen posesión del cargo. *Íd.*

En esa dirección, el Art. 3.7(3) del Código Electoral de 2020, *supra*, contempla tres (3) mecanismos para el proceso de nombramiento del Presidente y Presidente Alterno de la C.E.E. En apretado resumen, el *primer mecanismo* para la selección de la Presidencia y Presidencia Alterna de la C.E.E. establece que los Comisionados Electorales de los distintos partidos políticos (o partidos propietarios), mediante el voto unánime, serán quienes nombren a las personas llamadas a ocupar los mencionados puestos. Ello, luego de que el Comisionado

Electoral del Partido Estatal de Mayoría -- que, para efectos de esta ley, será el partido político que en la Elección General anterior haya obtenido la mayor cantidad de votos íntegros válidos en la Papeleta Estatal --, le proponga a los restantes Comisionados Electorales el o los nombres de la o las personas candidatas a dichos puestos. Este primer mecanismo del proceso de nombramiento del Presidente y Presidente Alterno de la C.E.E. deberá ocurrir dentro del término de treinta (30) días naturales contados a partir de la vacante en uno u otro de los mencionados cargos ejecutivos. No obstante, y si el voto de los Comisionados Electorales no logra un consenso -- la unanimidad -- respecto a uno o varios de los candidatos propuestos por el Comisionado Electoral del Partido Estatal de Mayoría, según definido en esta ley, entonces deberá activarse el próximo mecanismo.

De conformidad con lo dispuesto en el Art. 3.7(3) del Código Electoral de 2020, *supra*, el *segundo mecanismo* para la selección de la Presidencia y Presidencia Alterna de la C.E.E. establece que le corresponderá al Gobernador de turno someter a la consideración, tanto del Senado como de la Cámara de Representantes de Puerto Rico, los nombres de las personas que a su juicio cumplen con los requisitos para ocupar los mencionados cargos. Lo anterior, deberá realizarse no más tarde de quince (15) días naturales siguientes al vencimiento del término establecido en el primer mecanismo. Una vez sometido el o los nombres de la o de las personas nominadas

por el Gobernador ante ambos cuerpos legislativos, éstos deberán actuar en el término de quince (15) días para, mediante una votación de dos terceras partes (2/3) del total de sus miembros, brindar o no el consejo y consentimiento requerido para tales designaciones.

Por último, el *tercer mecanismo* dispuesto en el Art. 3.7(3) del Código Electoral de 2020, *supra*, expresa que el Pleno del Tribunal Supremo elegirá por mayoría de votos a las personas para ocupar el cargo de Presidente o Presidente Alterno de la C.E.E. Además, establece que la referida votación debe ser realizada no más tarde del término de quince (15) días naturales contados a partir de la ausencia de los nombramientos que corresponden al Gobernador o de la ausencia del consejo y consentimiento de la Asamblea Legislativa al cierre de la sesión ordinaria o extraordinaria en que recibieron el o los nombramientos. Este último mecanismo fue declarado inconstitucional por este Tribunal en *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, 2021 TSPR 141, 208 DPR __ (2021).

Por otra parte, el Art. 3.7(4) del Código Electoral de 2020, *supra*, establece los requisitos que deben cumplir las personas que, en su momento, ocupen los cargos de Presidente y Presidente Alterno de la C.E.E.[1] De igual forma, el Art.

---

[1] En esencia, cada uno de estos cargos debe ser ocupado por una persona que: 1) sea mayor de edad; 2) sea juez o jueza del Tribunal de Primera Instancia del Tribunal General de Justicia; 3) esté domiciliada en Puerto Rico a la fecha de su nombramiento; 4) sea una electora calificada; 5) sea de reconocida capacidad profesional; 6) tenga probidad moral; y 7) posea conocimiento en los asuntos de naturaleza electoral. *Íd.*

3.7(9) del mismo cuerpo legal, *supra*, dispone el proceder para sustituir a la persona que ocupe el cargo de Presidente o Presidente Alterno de la C.E.E ante la ausencia temporera o definitiva de uno de éstos, así como el término de duración que tendrá el nombramiento del sustituto -- para cualquiera de los cargos mencionados --, el cual será para completar el término del antecesor.

Así las cosas, y como muchos y muchas recordarán, el pasado 3 de septiembre de 2020 el entonces Presidente de la C.E.E., Hon. Juan E. Dávila Rivera, renunció a su puesto a raíz del atropellado proceso primarista que se vivió en el País en ese mismo año. Ante ello, y en consideración al andamiaje electoral previamente reseñado, el 7 de septiembre de 2020 los Comisionados Electorales de los cinco (5) partidos inscritos en la C.E.E.[2] seleccionaron unánimemente al Hon. Francisco J. Rosado Colomer, para ese entonces Juez Superior adscrito a la Región Judicial de Ponce, como nuevo Presidente de la C.E.E. Así también, en igual fecha, la Hon. Jessika D. Padilla Rivera, Jueza Superior asignada a la Región Judicial de Arecibo, fue seleccionada como Presidenta Alterna de la C.E.E. Desde entonces, éstos ejercieron los cargos de Presidente y Presidenta Alterna de la mencionada agencia. No obstante, luego de celebradas las elecciones generales el 4

---

[2] A saber: Partido Nuevo Progresista, Partido Popular Democrático, Partido Independentista Puertorriqueño, Movimiento Victoria Ciudadana y Proyecto Dignidad.

de noviembre de 2020, y de conformidad con lo establecido en el Art. 3.7 del Código Electoral de 2020, *supra*, los referidos nombramientos vencieron el 30 de junio de 2021.

En consecuencia, durante el mes de agosto de este año comenzó el proceso para nombrar a los nuevos Presidente y Presidente Alterno de la C.E.E., según establecido en el artículo de referencia del Código Electoral de 2020, *supra*. En atención a ello, la Lcda. Vanessa Santo Domingo Cruz, Comisionada Electoral del Partido Nuevo Progresista, nominó a cuatro (4) personas para ocupar los mencionados cargos. Empero, tras la disconformidad de los Comisionados Electorales con las cuatro (4) personas nominadas por ésta, el 7 de septiembre de 2021 el Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi Urrutia, sometió a la consideración de la Asamblea Legislativa los nombramientos de dos (2) personas para que ocupasen los cargos de Presidente y Presidenta Alterna de la C.E.E., a saber: el Hon. Jorge R. Rivera Ruedo y el Hon. Edgardo S. Figueroa Vázquez.

Sin embargo, y debido a la inacción de la Asamblea Legislativa en pasar juicio sobre los nombramientos ante su consideración durante el término dispuesto por el Art. 3.7(3) del Código Electoral de 2020, *supra*, -- y toda vez que se entendía que correspondía a los miembros de este Tribunal realizar los referidos nombramientos --, el 23 de septiembre de 2021 el Senado de Puerto Rico, representado por su Presidente, Hon. José L. Dalmau Santiago, incoó una demanda

ante el Tribunal de Primera Instancia en contra de esta Curia y del Gobierno de Puerto Rico. Mediante dicho recurso, éste cuestionó la validez constitucional de la precitada disposición estatutaria por, específicamente, considerar que el tercer mecanismo de nombramiento allí dispuesto violentaba la doctrina de separación de poderes consagrada en nuestra Constitución. Ello, al concentrar el poder de nominar a determinados puestos ejecutivos -- y el de brindar consejo y consentimiento a los mismos --, en un solo poder de gobierno, a saber, el Judicial.

Al respecto, y como ya adelantamos, el 15 de octubre de 2021 este Foro emitió una *Opinión* mediante la cual declaramos la inconstitucionalidad de dicha disposición -- en específico, aquello relacionado a que este Tribunal debía nombrar al Presidente y al Presidente Alterno de la C.E.E. -- por infringir la doctrina de separación de poderes. Véase, *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*.[3]

---

[3] En el referido caso, emitimos una Opinión de conformidad por entender que la concentración de la facultad de nominar y brindar consejo y consentimiento a los nuevos Presidente y Presidente Alterno de la C.E.E. en una sola rama de gobierno -- entiéndase, el Poder Judicial -- contraviene la doctrina de separación de poderes y diluye el delicado equilibrio que procura el sistema de pesos y contrapesos en que se funda nuestra Constitución. Véase, *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*, (Colón Pérez, opinión de conformidad).

Ahora bien, resulta necesario dejar meridianamente claro que nuestro proceder respondió, en esa ocasión, a disponer de una controversia sobre la inconstitucionalidad del Art. 3.7(3) del Código Electoral de 2020, *supra*, -- específicamente, en cuanto al tercer mecanismo de nombramiento para los cargos antes mencionados -- suscitada en el escenario de una sesión legislativa en curso. En ningún momento, la discusión en el precitado caso giró en torno al término de duración de los incumbentes en sus respectivos cargos, controversia que, hoy sí tenemos la oportunidad de atender.

Así pues, y sin que mediara actuación alguna con relación a los aludidos nombramientos luego de nuestro pronunciamiento, el 23 de noviembre de 2021 el Comisionado Electoral del Partido Proyecto Dignidad, Lcdo. Nelson Rosario Rodríguez (en adelante, "licenciado Rosario Rodríguez"), instó una demanda sobre sentencia declaratoria ante el Tribunal de Primera Instancia. En esencia, en el referido documento, éste adujo que los términos de los nombramientos de los actuales Presidente y Presidenta Alterna de la C.E.E., entiéndase el Hon. Francisco J. Rosado Colomer y la Hon. Jessika D. Padilla Rivera, vencieron el 30 de junio de 2021. Principalmente, alegó que, habiendo vencido el término de éstos y concluido la sesión legislativa -- la cual comenzó el 16 de agosto de 2021 y finalizó el 16 de noviembre de 2021 --, ambos puestos quedaron vacantes a tenor con lo resuelto por esta Curia en *Nogueras v. Hernández Colón (2)*, *infra*. Manifestó, además, que las actuaciones realizadas por los referidos funcionarios luego del pasado 16 de noviembre de 2021 dejaron de ser oficiales y deben declararse nulas toda vez que fueron realizadas tras vencer el término de sus nombramientos.

Trabada la controversia ante el Tribunal de Primera Instancia, y tras varios incidentes procesales no necesarios aquí pormenorizar, el pasado 3 de diciembre de 2021 el licenciado Rosario Rodríguez acudió ante nos mediante el recurso de *Certificación*. En su escrito, en síntesis, éste solicitó que se expidiese el caso de autos toda vez que el

mismo planteaba una controversia de alto interés público que requería atención inmediata por parte de este Tribunal.

Ante ello, el 6 de diciembre de 2021 notificamos una *Resolución* mediante la cual certificamos el presente caso y, entre otras cosas, le concedimos a todas las partes con interés en este litigio hasta las 4:00 p.m. del lunes, 20 de diciembre de 2021 para que presentaran sus respectivos alegatos.

Así las cosas, y en cumplimiento con lo ordenado, el pasado 20 de diciembre de 2021 este Tribunal recibió los alegatos de las partes con interés en el caso de autos. En específico, el Lcdo. Ramón A. Torres Cruz, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático; el Sr. Roberto Iván Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño; y la Sra. Lillian Aponte Dones, en su capacidad oficial como Comisionada Electoral del Movimiento Victoria Ciudadana, coinciden con los argumentos esbozados por el licenciado Rosario Rodríguez. En consecuencia, éstos solicitan que decretemos vacantes los puestos de Presidente y Presidente Alterno de la C.E.E. Esto último, al amparo de lo resuelto por este Tribunal en *Nogueras v. Hernández Colón (2), infra.*[4]

---

[4] Nótese que el Comisionado Electoral del Partido Independentista Puertorriqueño se suma a la solicitud del licenciado Rosario Rodríguez de declarar vacantes los cargos de Presidente y Presidente Alterno de la C.E.E. Así, sostiene que, ante la ausencia de acción de los Poderes Ejecutivo y Legislativo, y habiendo quedado vacantes los puestos de referencia, es necesaria la intervención de este Tribunal para conferir

Por su parte, y en igual fecha, el Senado de Puerto Rico compareció a este pleito en calidad de Amigo de la Corte. Particularmente, en su escrito, éste se une a la solicitud del licenciado Rosario Rodríguez y suplica que declaremos vacantes los puestos de Presidente y Presidente Alterno de la C.E.E., así como nulos aquellos actos realizados por los funcionarios en cuestión luego de la expiración de sus términos.

De otro lado, la Lcda. Vanessa Santo Domingo Cruz, en su capacidad oficial como Comisionada Electoral del Partido Nuevo Progresista, y la Oficina del Procurador General, en representación del Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi Urrutia, así como del Hon. Francisco J. Rosado Colomer y de la Hon. Jessika D. Padilla Rivera, presentaron sus respectivos alegatos. Particularmente, la Comisionada Electoral del Partido Nuevo Progresista arguye que la controversia del caso de marras fue atendida por esta Curia en *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*. Lo anterior, pues entiende que este Tribunal tomó en consideración la cláusula de continuidad contenida en el Código Electoral de 2020, *supra*, al momento de decretar la inconstitucionalidad del tercer mecanismo para la selección de la Presidencia y Presidencia Alterna de la C.E.E. En esa dirección, ésta solicita que declaremos no ha lugar el

algún tipo de dirección y legitimidad institucional a la función de administrar el andamiaje electoral.

recurso de *Certificación* presentado por el licenciado Rosario Rodríguez.

En tono similar, la Oficina del Procurador General solicita la desestimación del presente recurso por ausencia de legitimación activa. Sin embargo, en la alternativa, ésta solicita que declaremos no ha lugar el recurso de epígrafe para mantener a los actuales Presidente y Presidenta Alterna de la C.E.E. en sus puestos hasta tanto las ramas políticas nombren a sus sustitutos y éstos tomen posesión de sus cargos.

Trabada así la controversia, y con el beneficio de la comparecencia de ambas partes en el litigio, así como de otras partes interesadas, procedemos a exponer la normativa aplicable a ésta.

II.

Como es sabido, nuestra Carta Magna, en su Art. I, Sec. 2, claramente establece que "[e]l gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico". Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1. Así pues, desde el 25 de julio de 1952 -- fecha en que se proclamó la vigencia del Estado Libre Asociado de Puerto Rico -- adoptamos en nuestra jurisdicción un sistema republicano de gobierno sustentado en la separación de poderes entre los mencionados poderes de gobierno. Véase, *Díaz Carrasquillo v. García Padilla*, 191 DPR 97, 109 (2014);

*Noriega v. Hernández Colón*, 135 DPR 406, 458 (1994); *Hernández Agosto v. López Nieves*, 114 DPR 601, 619 (1983).[5]

Con relación al alcance de la aludida doctrina, -- y como hemos reiteradamente destacado --, el Lcdo. Víctor Gutiérrez Franqui, entonces miembro de la Asamblea Constituyente, expresó que ella significa "que cada [poder] del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia". 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 591 (1961). Cónsono con ello, el también delegado a la Asamblea Constituyente, Virgilio Brunet Maldonado, añadió que, al separar los poderes, debíamos rodear a cada uno de éstos de las protecciones que permitieran su ejercicio y funcionamiento sin que se supeditara a la intromisión de las otras ramas de gobierno. 3 Diario de Sesiones de la Convención Constituyente, 1800-1801 (1961).

Fue así como en nuestra Constitución se evitó, desde un principio, la concentración del poder en una sola rama de gobierno. Véase, *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*; *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 88 (1998); *Noriega v. Hernández Colón*, *supra*, págs. 458-459. Lo anterior, claro está, sin ignorar que la doctrina de separación de poderes nunca se concibió como una estructura

_____

[5] Para una discusión amplia y detenida sobre la doctrina de separación de poderes, véase, A. Acevedo Vilá, *Separación de Poderes en Puerto Rico: Entre la teoría y la práctica*, Puerto Rico, Ed. SITUM, 2018.

de naturaleza inmutable en que cada poder del gobierno funcionaría en un vacío e independiente de los otros. Véase, *Acevedo Vilá v. Meléndez*, 164 DPR 875, 883 (2005); *Noriega v. Hernández Colón*, *supra*, pág. 459; *Nogueras v. Hernández Colón (1)*, 127 DPR 405, 426 (1990). Ello, pues se trata, más bien, de que la interacción entre los tres (3) poderes de gobierno promueva un sistema de pesos y contrapesos con el propósito de "generar un equilibrio dinámico entre poderes coordinados y de igual rango, [para] evitar así que ninguno de éstos amplíe su autoridad a expensas de otro". *Misión Ind. P.R. v. J.P.*, *supra*, pág. 89. Véase, también, *Acevedo Vilá v. Meléndez*, *supra*; *Nogueras v. Hernández Colón (1)*, *supra*.

En otras palabras, se trata de mantener la colaboración entre los tres (3) poderes de gobierno sin que uno domine o interfiera de manera indebida con el otro. *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*; *Díaz Carrasquillo v. García Padilla*, *supra*; *Colón Cortés v. Pesquera*, 150 DPR 724, 750 (2000). De modo que la importancia de la referida doctrina recayó "en la separación, más no en la independencia absoluta de los poderes entre sí". *Hernández Agosto v. López Nieves*, *supra*.

### III.

Así pues, y con el fin de lograr el equilibrio dinámico que presupone la doctrina de separación de poderes, nuestra Carta Magna está apoyada de cláusulas que establecen funciones compartidas entre los distintos poderes de gobierno. Véase,

*Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*; *Nogueras v. Hernández Colón (2)*, 127 DPR 638, 650 (1991); *Hernández Agosto v. López Nieves*, *supra*, pág. 620. En esa dirección, y para dar vida a esos principios, en nuestro sistema de gobierno la facultad de nombramiento es compartida entre el Poder Ejecutivo y el Poder Legislativo. En específico, el Art. IV., Sec. 4, de la Constitución del Estado Libre Asociado de Puerto Rico dispone de manera expresa que será facultad y deber del Gobernador:

> Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión. Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria. Art. IV, Sec. 4, Const. ELA, LPRA, Tomo 1.

Como se puede apreciar, en la precitada cláusula, queda recogido el imperativo constitucional de colaboración entre los poderes políticos de gobierno al requerirse el consejo y consentimiento del Poder Legislativo para el nombramiento de ciertos funcionarios cuya responsabilidad recae sobre el Poder Ejecutivo. Véase, A. Acevedo Vilá, *Separación de Poderes en Puerto Rico: Entre la teoría y la práctica*, Puerto Rico, Ed. SITUM, 2018, pág. 111. A eso, precisamente, nos referimos cuando hablamos de separación de poderes.

En cuanto a esta función compartida, hace varias décadas este Tribunal, en *Hernández Agosto v. López Nieves*, *supra*, sentenció lo siguiente:

La doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno. En lo que atañe a nombramientos, la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación que le confieren la Constitución y las leyes. Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará únicamente a determinado candidato. *Íd*.

En esa dirección, y por estar intrínsecamente vinculado con lo anterior, es preciso repasar -- en el contexto de los nombramientos realizados por el Poder Ejecutivo, que requieren el consejo y consentimiento del Poder Legislativo -- todo lo relacionado con la cláusula de continuidad o *holding over*. En cuanto a ésta, se ha explicado que se trata de "un mecanismo en virtud del cual un funcionario que ocupa un cargo en propiedad pued[a] continuar ocupándolo aun después de expirado su término hasta tanto su sucesor sea nombrado y tome posesión" de éste. C. E. Cortés Feliciano, *Nombramientos de receso sucesivos: ¿despoje de la facultad de consejo y consentimiento del Senado?*, 86 Rev. Jur. UPR 192, 204 (2017). En palabras más sencillas, la mencionada cláusula permite "prorrogar los términos de efectividad de un nombramiento". *Íd*.

En las primeras interpretaciones que este Tribunal realizó sobre el alcance de la referida cláusula de continuidad o *holding over*, mencionamos que los propósitos de este tipo de cláusula eran dos (2): **1) mantener en el cargo a una persona que ha sido nombrada con el consejo y**

**consentimiento del Senado**, incluyendo el periodo después del vencimiento de su término, hasta que éste pueda concurrir con el Gobernador en volverlo a nombrar o elegir un sucesor; y 2) evitar vacantes que aborrece la ley por éstas entorpecer la continuación de la administración de los asuntos públicos. Véase, *González v. Corte*, 62 DPR 161, 165 (1943). Véase, además, *Brunet Justiniano v. Gobernador*, 130 DPR 248, 258 (1992); *Nogueras v. Hernández Colón (2)*, *supra*, pág. 647; *Betancourt Morales v. Gobernador de P.R.*, 118 DPR 149 (1986); *J.R.T. v. Milares Realty, Inc.*, 90 DPR 844 (1964); *Fernández v. Corte*, 71 DPR 161, 178 (1950). Ello, con el paso del tiempo, varió un poco.

Y es que, en *Nogueras v. Hernández Colón (2)*, *supra*, este Tribunal tuvo que resolver si la cláusula de continuidad debía tener el efecto de mantener indefinidamente en sus cargos a ciertos jueces cuyos términos habían vencido. *Íd.*, pág. 648. En particular, esta Curia debía determinar si la expectativa de continuidad tenía algún límite y, de ello responderse en la afirmativa, cuál era el término máximo permisible. *Íd.*

**Así pues, al realizar el análisis de rigor, desde aquel entonces, dispusimos que la indefinición en el término de duración de un nombramiento por virtud de la cláusula de continuidad de la legislación en cuestión infringía "el equilibrio que intenta[ba] mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa".** (Énfasis suplido). *Íd.*, pág.

651.[6] **Y, lo que es más, expresamos que "[t]al indefinición abona[ba] el terreno para que se produ[jera] una situación en la que se trasto[caría] el firme equilibrio deseado a la hora de extender nombramientos que requi[ri]eran [el] consejo y consentimiento del Senado".** (Énfasis suplido). *Íd.*

**Es por todo lo anterior, que en aquella ocasión entendimos que en nuestro ordenamiento jurídico no había cabida para que los términos de las cláusulas de continuidad fuesen indefinidos. Por eso, en el precitado caso -- tras adoptar la norma establecida previamente en *Hernández Agosto v. López Nieves*, *supra* -- resolvimos, sin ambages, que:**

> **[E]l término de duración del incumbente (holding over) en virtud de la llamada cláusula de continuidad no es ilimitado. El mismo se extendería hasta que su sucesor tome posesión del cargo pero nunca después de finalizada la próxima sesión legislativa siguiente a dicha expiración. Si los Poderes Ejecutivo y Legislativo no logran llegar a un acuerdo sobre la renominación del incumbente o su sucesor antes de finalizada la sesión ordinaria señalada, el cargo quedaría vacante hasta tanto ambos poderes descarguen su obligación constitucional de nombramiento. Este resultado está acorde con la doctrina de separación de poderes y con las razones estatutarias que**

---

[6] Si bien somos conscientes de que las cláusulas de continuidad se establecen para evitar vacantes que la ley aborrece, y que lo deseable en estas circunstancias es que aquella persona que fue nombrada por el Primer Ejecutivo con el consejo y consentimiento del Senado -- método primario de nombramiento -- continúe ejerciendo su cargo hasta que su sucesor sea nombrado y tome posesión de éste, no menos cierto es que esa no es la realidad de los funcionarios en cuestión en el caso de autos. Y es que, como sabemos, estos últimos fueron seleccionados mediante el voto unánime de los Comisionados Electorales de los cinco (5) partidos políticos de conformidad con el primer mecanismo contemplado en el Art. 3.7(3) del Código Electoral de 2020, *supra*, y no bajo la cláusula de nombramiento a la que hemos aludido. En ese sentido, una mayoría de este Tribunal extrapola y descansa erróneamente en la crítica que realiza el profesor José Julián Álvarez González a lo pautado en *Nogueras v. Hernández Colón (2)*, *supra*, la cual parte de la premisa de que los nombramientos en cuestión se efectuaron bajo el método primario dispuesto para ello en nuestra Constitución. Véase, además, J.J. Álvarez González, *Derecho constitucional*, 61 Rev. Jur. UPR 637 (1992).

**inspiraron la cláusula de continuidad.** (Énfasis suplido). *Íd.,* págs. 652-653.

Dicho de otro modo, el término de un cargo al amparo de una cláusula de continuidad no puede ser *ad infinitum*, sino que su extensión será hasta que finalice la sesión legislativa siguiente a la fecha de vencimiento de éste. Lo anterior, ha sido un precedente firmemente establecido en nuestra jurisdicción.

IV.

Así las cosas, tal como lo hemos hecho en el pasado, no podemos obviar, en nuestro análisis, lo concerniente al valor del precedente y la doctrina del *stare decisis* que rige en el ordenamiento jurídico puertorriqueño. Este concepto proviene del latín *stare decisis et non quieta movere*, lo cual significa mantenerse con lo decidido y no perturbar la calma. Véase, *Ramos v. Louisiana*, 140 S. Ct. 1390, 590 US ___ (2020) (Sotomayor, opinión concurrente); *Townsend v. Jemison*, 50 US 407 (1850). El propósito de esa doctrina es que un tribunal, en aras de proveer certidumbre y estabilidad en las relaciones jurídicas en el país, siga sus dictámenes previos. *Rivera Ruiz v. Mun. de Ponce*, 196 DPR 410, 429 (2016). Véase, además, *Am. Railroad Co. v. Comisión Industrial*, 61 DPR 314, 326 (1943). Ello, como elemento esencial para generar la confianza de los ciudadanos y ciudadanas en su sistema de justicia. *Asoc. de Maestros v. Dpto. de Educación*, 200 DPR 974, 1110 (2018) (Colón Pérez, opinión disidente).

Ahora bien, esta doctrina admite excepciones, por lo que los tribunales no están llamados a seguir un precedente cuando esté presente alguna de las siguientes circunstancias: 1) el precedente establecido fue claramente erróneo; 2) sus efectos sobre el ordenamiento sean adversos; o 3) la cantidad de personas que confiaron en éste fuese limitada. *Pueblo v. Camacho Delgado*, 175 DPR 1, 20 esc. 4 (2008). Véase, además, *González v. Merck*, 166 DPR 659, 688 (2006). Sin lugar a duda, dichas excepciones no están presentes en el caso de autos.

Es, pues, a la luz de la normativa antes expuesta, y no de otra, que procedía disponer de la controversia ante nuestra consideración. Como una mayoría de este Tribunal no lo hizo, procedemos -- desde el disenso -- a así hacerlo.

V.

Conforme mencionamos anteriormente, en el presente caso el licenciado Rosario Rodríguez arguye que los puestos de Presidente y Presidenta Alterna de la C.E.E. debieron quedar vacantes luego del 16 de noviembre de 2021, fecha en que culminó la sesión legislativa. Como consecuencia de ello, éste señala que los actos realizados por los mencionados funcionarios con posterioridad a dicha fecha son nulos por haber vencido el término de sus nombramientos. Le asiste la razón.

Al así sentenciarlo, si bien reconocemos que el Art. 3.7(2) del Código Electoral de 2020, *supra*, contiene una cláusula de continuidad, -- la cual establece que el término

de duración de los nombramientos de referencia será de cuatro (4) años a partir del primero (1ro) de julio del año siguiente a una elección general, hasta que los sucesores sean nombrados y tomen posesión del cargo --, también somos conscientes de que lo anterior no puede interpretarse de manera contraria a nuestros pronunciamientos en *Nogueras v. Hernández Colón (2)*, *supra*. Así lo requería un correcto ejercicio de interpretación judicial.

**A tenor con ello, de haberse realizado ese correcto ejercicio de interpretación judicial al que hemos hecho referencia, forzoso era concluir que el término de duración de los nombramientos de los actuales Presidente y Presidenta Alterna de la C.E.E. -- entiéndase, el Hon. Francisco J. Rosado Colomer y la Hon. Jessika D. Padilla Rivera -- en virtud de la llamada cláusula de continuidad no es ilimitado. El mismo podría ser extendido hasta que sus sucesores tomaran posesión de sus cargos, pero nunca después de finalizada la sesión legislativa siguiente a dicha expiración. Disponer lo contrario, a todas luces, atentaría contra el equilibrio de poder sobre el que está cimentada nuestra Constitución y, por ende, contra la doctrina de separación de poderes. En particular, con la tarea de brindar consejo y consentimiento del Poder Legislativo, en escenarios donde el Poder Ejecutivo decida cruzarse de brazos y no realizar nombramiento alguno.**

No podemos pues, so color de solucionar un caos administrativo, crear un caos constitucional. Una vez más, en

un País que se hace llamar democrático, ello no debe tener espacio.

En consecuencia, -- como bien señala el licenciado Rosario Rodríguez -- el Hon. Francisco J. Rosado Colomer y la Hon. Jessika D. Padilla Rivera ocupan sus cargos ilegalmente. Por lo cual, todos los actos llevados a cabo por los mencionados funcionarios luego del 16 de noviembre de 2021 son patentemente nulos, y continúan minando la confianza y credibilidad que históricamente nuestro País había tenido en la C.E.E.

Expuesto lo anterior, y ante la desacertada opinión emitida por una mayoría de esta Curia, insistimos nuevamente en que urge que el Poder Ejecutivo y el Poder Legislativo ejerzan sus funciones constitucionales para llenar las vacantes a los cargos de Presidencia y Presidencia Alterna de una agencia tan medular para el funcionamiento del esquema político de nuestro Pueblo.

En fin, como quedó en extremo evidenciado -- y según señalamos en nuestra Opinión de conformidad en *Senado de Puerto Rico v. Tribunal Supremo de Puerto Rico*, *supra*, -- "[e]l hecho de que la falta de dirección en un departamento del gobierno pued[a] resultar altamente perjudicial para el [P]aís, no es sino razón para el ejercicio responsable de los deberes que la Constitución impone a los poderes políticos con relación a estos nombramientos". *Hernández Agosto v. López Nieves*, *supra*, pág. 622.

VI.

Es, pues, por los fundamentos expuestos, que enérgicamente disentimos del curso de acción seguido por una mayoría de este Tribunal.


                                    Ángel Colón Pérez
                                    Juez Asociado